UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL A. KITCHEN,

     Plaintiff,

v.

GRETCHEN WHITMER,
HEIDI WASHINGTON, and
MICHAEL EAGEN,

     Defendants.

Case No. 18-11430
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

**OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [50] AND**
**GRANTING DEFENDANTS' MOTION TO DISMISS [55]**

---

In *Graham v. Florida*, the Supreme Court held that the Eighth Amendment requires states to provide juvenile nonhomicide offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." And in *Miller v. Alabama*, the Supreme Court held that the Eighth Amendment requires a judge to account for the "mitigating qualities of youth" before sentencing a juvenile offender to life in prison without parole.

Michael Kitchen is a juvenile nonhomicide offender. And while he was not given a life sentence for his convictions, he was sentenced to more than four decades in prison without parole. And the state judge who sentenced Kitchen in 1987 did not explicitly account for the "mitigating qualities of youth." Further, setting aside credit for good behavior, Kitchen's first "opportunity to obtain release based on demonstrated maturity and rehabilitation" would not come until age 59.

Based on those facts and *Graham* and *Miller*, Kitchen has filed this lawsuit. But Kitchen does not directly challenge his sentence or ask for resentencing. Instead, he homes in on state laws that equate an offender's first opportunity for parole review with the completion of the offender's

minimum prison term. As applied to Kitchen, these laws require Kitchen to serve 42 years in prison (less credits for good behavior) before the parole board may review him for release. Because these parole-eligibility laws do not distinguish between adult and juvenile offenders, i.e., because they do not factor in the "mitigating qualities of youth," Kitchen believes they violate the Eighth Amendment. He also believes that these laws violate the Equal Protection Clause and the Due Process Clause.

Two motions are pending for this Court's resolution. Kitchen seeks a preliminary injunction based on his claims under the Eighth Amendment, the analogous provision in the Michigan Constitution, and the Due Process Clause. Defendants—Michigan's governor, the director of Michigan's Department of Corrections, and the chairperson of Michigan's parole board—ask this Court to dismiss Kitchen's equal-protection and due-process claims. For the reasons set out below, Kitchen's motion will be denied and Defendants' granted.

## I.

### A.

In March 1987, Kitchen was charged with, among other things, armed robbery, felony firearm, and criminal sexual conduct. (ECF No. 51, PageID.340.) Kitchen says he merely served as a "look out" while two others robbed a couple over a drug debt. (ECF No. 50, PageID.282.) He also states that during the robbery, the female victim was sexually "penetrated with a finger for two seconds." (*Id.*) At the time of the robbery, Kitchen was only 17 years old.

Kitchen pled guilty to all charges except for criminal sexual conduct and felony firearm. (ECF No. 51, PageID.340.) On those charges, he went to trial. A Michigan jury found him guilty. (*Id.*)

By any measure, Kitchen was given a harsh sentence. For the criminal sexual conduct conviction, Oakland County Circuit Court Judge Richard D. Kuhn, Sr. sentenced Kitchen to a minimum of 40 years in prison. (ECF No. 55, PageID.398.) Except for the felony firearm convictions, Judge Kuhn ran Kitchen's other, shorter sentences concurrent to that 40-year sentence. (*See id.*) But he made the two-year sentences for the felony firearm convictions consecutive to the 40-year sentence. (*Id.*) In all then, Judge Kuhn sentenced Kitchen, a 17-year-old, to a minimum of 42 years in prison.

**B.**

In 2010, after Kitchen had spent 23 years in prison, the U.S. Supreme Court decided *Graham v. Florida*, 560 U.S. 48 (2010). There, the Court held that the Eighth Amendment prohibits juvenile offenders who do not commit homicide from being sentenced to life without parole. *Id.* at 75. The Court reasoned that juveniles are different from adults in ways that matter to the Eighth Amendment: they have an "underdeveloped sense of responsibility," they "are more vulnerable . . . to negative influences and outside pressures" than adults, and they are more amenable to rehabilitation than adults. *Id.* at 68 (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)). And, said the Court, people who do not kill are "less deserving of the most serious forms of punishment." *Id.* at 69. Thus, juvenile offenders who do not kill have "twice diminished moral culpability." *Id.* Further, the Court noted that it was "questionable" that a judge could accurately decide that a juvenile offender is incorrigible at the time of sentencing: "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 73 (quotation marks omitted). For these and other reasons, the Court held that the Eighth Amendment required states to give juvenile nonhomicide offenders "some

meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75.

Two years later, the Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012). There, the Court held that the Eighth Amendment forbids sentencing schemes that required juvenile offenders to be sentenced to life in prison without the possibility of parole. *Id.* at 479. As in *Graham*, the Court stressed that youth "is a time of immaturity, irresponsibility, impetuousness, and recklessness." *Id.* at 476 (internal quotation marks and alternations omitted). Although a judge could still sentence a juvenile homicide offender to life in prison without parole, the judge could do so only after "tak[ing] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

A few years after *Miller*, the Supreme Court decided *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). Not only did the Court hold that *Miller* applied to "juvenile offenders whose convictions and sentences were final when *Miller* was decided," *id.* at 725, but it also found that *Miller* had created a categorical rule, *see id.* at 729. Aside from "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility," juvenile offenders as a class could not be sentenced to life in prison without the possibility of parole. *See id.* at 734.

## C.

In 2018, Kitchen, having spent the prior 31 years in prison, filed this lawsuit. His second amended complaint (which the Court will simply refer to as the "complaint") relies in substantial part on *Miller* and *Graham*. (*See* ECF No. 51.)

To appreciate Kitchen's claims and the relevance of *Miller* and *Graham* to them, some background on Michigan's indeterminate sentencing scheme is helpful. In Michigan, the judicial, legislative, and executive branches each play a role in deciding how long an offender will spend

in prison. The judge sets the minimum term that the offender will spend in prison; for Kitchen, that is 42 years. The legislature, through its statutes, sets the maximum prison term; for Kitchen, that is 60 years. The precise amount of time that an offender will spend in prison—42 years, 60 years, or something in between—is the call of the executive branch, and more specifically, the parole board.

Two statutes that help implement this scheme are relevant here: a prisoner is "subject to the jurisdiction of the parole board when the prisoner has served a period of time equal to the minimum sentence imposed by the court for the crime of which he or she was convicted, less good time and disciplinary credits, if applicable." Mich. Comp. Laws § 791.234(1); *see also* Mich. Comp. Laws § 791.233b (listing crimes eligible for disciplinary credits). Thus, under § 791.234(1), § 791.233b, and the implementing regulations and rules (collectively, the "parole-eligibility laws"), Kitchen will not come within the jurisdiction of the parole board until he has served 42 years in prison less disciplinary credits (which are currently projected to put him before the parole board after 39.5 years).

With that background on Michigan's sentencing scheme, Kitchen's claims are more readily understood. Because the parole-eligibility laws require all offenders—adults and juveniles alike—to serve their entire minimum sentence before being reviewed for parole, Kitchen believes that the laws are unconstitutional. In Kitchen's view, because the parole-eligibility laws do not account for the "mitigating qualities of youth," *Miller*, 567 U.S. at 476, they violate the Eighth Amendment and the analogous provision in the Michigan Constitution, (ECF No. 51, PageID.340–341, 349–350). Kitchen also believes the parole-eligibility laws violate the Equal Protection Clause and the substantive component of the Due Process Clause. (ECF No. 51, PageID.344–348.)

**D.**

This opinion addresses two motions pending before the Court. (ECF No. 50, 55.) Kitchen seeks a preliminary injunction based on his claims under the Eighth Amendment, Michigan's analog, and the Due Process Clause. (*See* ECF No. 50.) (He has not sought preliminary relief based on his Equal Protection Clause claim.) Defendants—Governor Gretchen Whitmer, Director of the Michigan Department of Corrections Heidi Washington, and Chairperson of the Parole Board Michael Eagan—move to dismiss Kitchen's claims under the Equal Protection Clause and the Due Process Clause. (*See* ECF No. 55.) (Because this Court previously addressed Defendants' motion to dismiss Kitchen's claims under the Eighth Amendment and Michigan's analog, *see Kitchen v. Snyder*, No. 18-11430, 2019 WL 3859887 (E.D. Mich. Aug. 16, 2019), the Court did not permit Defendants to file a second Rule 12 motion directed at those claims.)

**II.**

The Court starts with Kitchen's motion for preliminary relief.

**A.**

In response to Kitchen's request for an injunction pursuant to the Eighth Amendment and Michigan's analog, Defendants make a single argument: they claim that when Judge Kuhn sentenced Kitchen to a minimum of 42 years in prison, Judge Kuhn considered Kitchen's youth. (ECF No. 56, PageID.413–416.) Defendants highlight that at sentencing, Kitchen's counsel stated that Kitchen was "a young 17-year-old man" (ECF No. 55, PageID.394), that Kitchen's parents had done all they could to "shape and mold this young man" (*id.* at 395), and that there was nothing in "this young man's record that would indicate or suggest that he is in any way a hardened criminal" (*id.*).

Fair enough; but that only goes to show that Judge Kuhn was aware of the obvious: that Kitchen was a young man. From there it is quite the leap to say that Judge Kuhn factored into his sentence that juvenile offenders like Kitchen have an "underdeveloped sense of responsibility," "are more vulnerable . . . to negative influences and outside pressures," and are more amenable to rehabilitation than adults, *Miller*, 567 U.S. at 471—especially when nothing in the sentencing transcript suggests anything of the sort. Indeed, each of those characteristics cut against harsh penalties for juveniles, yet Judge Kuhn chose to vary *upward* from the guidelines. (ECF No. 55, PageID.398.) In justifying this decision, Judge Kuhn focused primarily on the seriousness of the offense, stating that this was "one of the most heinous crimes" he had tried. (ECF No. 55, PageID.399–400.) Judge Kuhn also briefly mentioned disciplining and punishing Kitchen, protecting society, and deterring others. (*Id.* at PageID.399.) Nowhere did Judge Kuhn acknowledge that these penological aims apply with less force to a juvenile offender, and even less force to a juvenile nonhomicide offender. *Miller*, 567 U.S. at 472 ("*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."); *Graham*, 560 U.S. at 69 ("[W]hen compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability.").

So, in this Court's view, Judge Kuhn did not account for Kitchen's youth in the way *Miller* contemplates.

**B.**

As noted, Defendants' sole argument is that Kitchen's youth was factored into his sentence; a decision to go "all in" on a losing hand is often costly. But here, regardless of Defendants' response, Kitchen still has the burden of showing that a preliminary injunction is necessary.

And a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (internal quotation marks omitted). Kitchen "faces a burden of proof more stringent than the proof required to survive a summary judgment motion." *Id.* (internal quotation marks omitted).

So, even though Defendants have not ventured into the vast sea of law applying *Miller* and *Graham*, this Court must still do so to decide whether Kitchen is entitled to injunctive relief.

**C.**

There is one more threshold issue before turning to the merits of Kitchen's claims: does Kitchen have one Eighth Amendment claim or two?

It appears Kitchen has two. As explained, *Miller* prohibits a judge from sentencing a juvenile offender to life without parole without first factoring in the mitigating qualities of youth. And, as just explained, Kitchen's youth was not considered when he was sentenced. So, even though not sentenced to life without parole, Kitchen has a claim under *Miller*—if his prison term is long enough to trigger *Miller*'s protections. As also explained, *Graham* requires states to give juvenile nonhomicide offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 75. So Kitchen has a claim under *Graham*— if his opportunity for release comes so late that it would not be "meaningful."

To be sure, the two claims are closely related; but some courts have entertained claims under *Graham*'s "meaningful opportunity for release" language even when the juvenile offender's youth was factored into the initial sentence as required by *Miller*. *See United States v. Mathurin*, 868 F.3d 921, 927 (11th Cir. 2017); *Sen v. State*, 390 P.3d 769, 775 (Wyo. 2017) (addressing *Graham*-style claim where juvenile did not argue that his youth had not been factored into his

sentence, as required by *Miller*). And other courts have acknowledged that even if a judge factored in youth in sentencing a juvenile to, say, 50 years without parole, *Graham* might still require parole review *before* the end of the 50-year period. *See State v. Zuber*, 152 A.3d 197, 214–15 (N.J. 2017); *Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1035 n.4 (Conn. 2015) (noting distinction between a *Miller* claim and a *Graham* "second look" claim). This comports with *Graham*'s statement that states cannot decide "at the outset" that a juvenile nonhomicide offender should spend his entire life in prison. 560 U.S. at 75. And it comports with *Montgomery*. *See* 136 S. Ct. at 734 ("Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity." (internal quotation marks omitted)).

Thus, while *Miller*'s route to relief significantly overlaps with *Graham*'s, the Court will assume in Kitchen's favor that the paths do diverge. The Court will do so because, as explained next, Kitchen has not shown that either path gets him to where he needs to go.

### D.

The Court heads down the *Miller* path first.

*Miller* only expressly addressed sentences of life without parole, i.e., the juvenile offender is certain to die in prison. So a first step on this path is whether a long term-of-years sentence even implicates *Miller*. Intuitively, it should; the difference between a sentence of life in prison without parole and 100 years in prison without parole is merely semantic. *See Budder v. Addison*, 851 F.3d 1047, 1056 (10th Cir. 2017); *McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016); *Moore v. Biter*, 725 F.3d 1184, 1191 (9th Cir. 2013). So that portion of the *Miller* path is easy to traverse.

But the terrain gets tough from there. Kitchen's minimum sentence was not 100 years. In fact, had he earned all of his disciplinary credits, he would have been eligible for parole after about

36 years in prison, at age 53.[1] And even though Kitchen did not earn all available disciplinary credits, he is still currently slated for parole review in December 2026, when he will have served about 39.5 years in prison. (ECF No. 56, PageID.409.) And even if Kitchen had not earned a single disciplinary credit, he would have come before the parole board after 42 years in prison, at age 59. None of these prison terms—ranging from 36 to 42 years without parole—indisputably exceeds Kitchen's lifespan like a sentence of 100 years without parole.

So the key question is where to draw the line? Or phrased more precisely, does it violate the Eighth Amendment to sentence a 17-year-old offender to 42 years in prison without parole without accounting for the mitigating qualities of youth?

In answering the "how long is long enough" question, no authority binds the Court. True, in both *Starks v. Easterling*, 659 F. App'x 277 (6th Cir. 2016), and *Atkins v. Crowell*, 945 F.3d 476 (6th Cir. 2019), juvenile offenders argued that because their youth was not factored into a sentence that required them to be imprisoned for at least 51 years, their sentences violated the Eighth Amendment. And true, in both cases the Sixth Circuit found that the juvenile offender was not entitled to relief. *Starks*, 659 F. App'x at 280–81; *Atkins*, 945 F.3d at 479–80. But in both cases, a state court had already ruled that *Miller* did not apply, so 28 U.S.C. § 2254(d) constrained the Sixth Circuit's review. *Starks*, 659 F. App'x at 279; *Atkins*, 945 F.3d at 477. Indeed, the Sixth Circuit was not at liberty to say that the state courts' interpretation of *Miller* was wrong, even if it

---

[1] Due to multiple revisions to Michigan's good-time scheme, determining whether Kitchen is entitled to time off his minimum sentence, and how much, was not straightforward. *See Lowe v. Dep't of Corr.*, 521 N.W.2d 336, 336–38 (Mich. Ct. App. 1994) (discussing some revisions). Although it seems like § 800.33(2) could apply because Kitchen's offense was before April 1, 1987, the Court believes that Mich. Comp. Laws § 800.33(5) applies to Kitchen's sentence. *See* Mich. Comp. Laws § 800.33(2) ("Except as otherwise provided in this section," which includes subsection (5)). As such, Kitchen was eligible for "disciplinary credit" at a rate of "5 days per month for each month served." *See* Mich. Comp. Laws § 800.33(5). After 36 years in prison, that is 2,160 days, which is almost six years.

was wrong. *See White v. Woodall*, 572 U.S. 415, 419 (2014) ("[A]n unreasonable application of [Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." (internal quotation marks omitted)). And while two judges wrote separately in *Starks* and *Atkins* to make clear that, properly interpreted, the juvenile offenders' sentences did violate *Miller*, *see Starks*, 659 F. App'x at 281 (White, J., concurring); *Atkins*, 945 F.3d at 480 (Cole, C.J., concurring), both Starks' and Atkins' first opportunity for release was after 51 years in prison. Kitchen's sentence contemplates parole review at least nine years earlier.

Although there is no binding authority, that does not mean there is no persuasive authority. Many state supreme courts have answered the question of "how long is long enough?" and have used varying approaches to answer that question. Some state high courts have considered the juvenile offender's life expectancy in deciding whether a term-of-years sentence was long enough to trigger *Miller*'s protections—i.e., whether the sentence was, in effect, a life sentence. *See Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1046 (Conn. 2015); *Pedroza v. State*, 291 So. 3d 541, 545 (Fla. 2020). Other state supreme courts have rejected a life-expectancy approach and instead concentrated on the "children are different" rationale underlying *Miller*'s holding. *State v. Null*, 836 N.W.2d 41, 71–73 (Iowa 2013) (conceding that the evidence did not establish that the juvenile's sentence was beyond his life expectancy, but finding that a 52-year sentence could not "escape the rationales of *Graham* or *Miller*"); *Bear Cloud v. State*, 334 P.3d 132, 142 (Wyo. 2014) (following *Null*). At least one state supreme court examined what the state legislature had suggested was a sentence long enough to trigger *Miller*'s (and *Graham*'s) protections. *See People v. Buffer*, 137 N.E.3d 763, 774 (Ill. 2019). And one court looked at several of these criteria. *See Carter v. State*, 192 A.3d 695, 734 (Md. 2018). (This Court also looked to the federal appellate courts for guidance, but those cases either addressed prison terms far longer than Kitchen's, *see,*

*e.g.*, *Moore*, 725 F.3d at 1191, addressed the *Miller* claim under § 2254(d), *see, e.g.*, *Atkins*, 945 F.3d at 477, or addressed the *Miller* claim under plain-error review, *see United States v. Walton*, 537 F. App'x 430, 437 (5th Cir. 2013).)

None of these approaches warrants a preliminary injunction.

Try the approach that focuses on the rationale underlying *Miller*'s holding first. The Supreme Court certainly stressed that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471 (internal quotation marks omitted). "Because juveniles have diminished culpability and greater prospects for reform," the Court explained, "they are less deserving of the most severe punishments." *Id.* at 471 (internal quotation marks omitted); *see also Montgomery*, 136 S. Ct. at 736 (stating that *Miller*'s "central intuition" was that "children who commit even heinous crimes are capable of change"). So focus more on *Miller*'s "children are constitutionally different" rationale, and it seems that the Eighth Amendment would require consideration of the mitigating qualities of youth before requiring a juvenile nonhomicide offender to spend 42 years in prison. But *Miller* also analogized life without parole to the death penalty: "Life-without-parole terms . . . share some characteristics with death sentences that are shared by no other sentences. Imprisoning an offender until he dies alters the remainder of his life by a forfeiture that is irrevocable." *Miller*, 567 U.S. at 474–75 (internal quotation marks omitted). So focus more on the rationale that being sentenced to die in prison is like being sentenced to death, and 42 years seems too short to trigger *Miller*'s protections. Although it is his burden, Kitchen has not explained why the scope of *Miller* should depend more on the former rationale than the latter.

Next consider, as some courts have, legislative responses to *Graham* and *Miller* and what those responses have to say about a 42-year prison term.

The Illinois Supreme Court perhaps relied more heavily on its legislature's response than any other state high court. In *People v. Buffer*, the court noted that in response to *Graham* and *Miller*, the Illinois legislature had passed a law requiring juveniles convicted of certain types of murder to serve at least 40 years in prison whereas adults convicted of those same crimes could receive life without parole. 137 N.E.3d at 773. The court reasoned, "The legislature evidently believed that this 40-year floor for juvenile offenders who commit egregious crimes complies with the requirements of *Miller*." *Id.* at 773–74. The Illinois Supreme Court thus held, "In determining when a juvenile defendant's prison term is long enough to be considered de facto life without parole, we choose to draw a line at 40 years." *Id.* at 774.

Applying the Illinois Supreme Court's approach requires an examination of Michigan's response to *Miller*. Following *Miller*, Michigan enacted legislation to resentence juveniles convicted of crimes that mandated life without the possibility of parole. *See* Mich. Comp. Laws § 769.25(2) (listing applicable crimes). During the resentencing process, the prosecution can again seek life without parole; if it does, "the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the factors listed in *Miller*." *See* Mich. Comp. Laws §§ 769.25(6), 769.25a(4)(b). But the statutes do not expressly provide for a *Miller* hearing if the prosecution does not again seek life without parole; instead the statute merely says, "the court shall sentence" the juvenile offender to a minimum term "not less than 25 years or more than 40 years." *See* Mich. Comp. Laws §§ 769.25(4), (9), 769.25a(4)(c).

The Michigan legislature's response to *Miller* does not give clear insight into what Michigan's elected officials would think about a juvenile nonhomicide offender sentenced to 42 years without parole.

On the one hand, the legislature only provided for the resentencing of juvenile offenders who were exposed to life without parole sentences; it did not provide for resentencing of juvenile offenders who, like Kitchen, were only exposed to term-of-year sentences; so, possibly, the Michigan legislature believes that *Miller* is limited to life without parole sentences. Strengthening that inference is that the Michigan legislature only expressly provided for a *Miller* hearing when the prosecution again sought a life without parole sentence. *See* Mich. Comp. Laws §§ 769.25(6), 769.25a(4)(b).

On the other hand, the legislature provided that when the prosecution does not seek life without parole, the juvenile offender could be sentenced to no more than 40 years without parole; and, in that scenario, the Michigan legislature did not expressly provide for a *Miller* hearing. So, perhaps, the Michigan legislature believed that, absent a hearing for the express purpose of evaluating the mitigating qualities of youth, 40 years without parole was the maximum a judge could impose on a juvenile offender. Kitchen, of course, was sentenced to more than 40 years.

Thus, competing inferences can be drawn from the Michigan legislature's response to *Miller*. And Kitchen, who has the burden of persuasion, does not say why one inference is stronger than the other. So the Court does not find that the Illinois Supreme Court's approach to extending *Miller* warrants preliminary injunctive relief.

And looking beyond Michigan's borders does not clarify matters. True, after *Graham* and *Miller*, at least 12 states have passed laws ensuring that juvenile offenders receive their first parole review after 15, 20, or 25 years in prison. *See People v. Contreras*, 411 P.3d 445, 455–56 (Cal. 2018) (collecting legislative responses); *State v. Zuber*, 152 A.3d 197, 215 n.4 (N.J. 2017) (same). Perhaps these state legislatures thought that parole review after say, 25 years in prison, was required by *Miller*'s "children are constitutionally different" rationale and *Graham*'s requirement

14

for a "meaningful opportunity for release based on demonstrated maturity and rehabilitation." But it is also plausible is that these legislatures went beyond what *Miller* and *Graham* demanded. Indeed, in the wake of *Graham* and *Miller*, some states have guaranteed juvenile nonhomicide offenders parole review after just 15 years in prison. *See* Nev. Rev. Stat. § 213.12135(a); W.Va. Code § 61-11-23(b). So perhaps state legislatures (although not yet Michigan) went beyond the bare minimum demanded by the Constitution. And Kitchen, who has the burden of persuasion, does not say why that is not the case.

That leaves the life-expectancy approach. Under this approach, the longer Kitchen must spend in prison before parole review, the stronger his claim under *Miller* (think, again, about the 100-year sentence). So the Court will assume in Kitchen's favor that 42 years without parole is the proper prison term for a *Miller* analysis, and thus, Kitchen will be reviewed for parole at age 59. Under that assumption, the task is to decide whether Kitchen is expected to live past age 59.

As courts have recognized, that is a difficult question to answer. One challenge is determining the proper pool of people to calculate average life expectancy. Does the pool consist of all people? All men? All African American men? All African American men born in 1970 (when Kitchen was born)? Reasonable minds could disagree as to which of these pools is proper. Moreover, using certain demographic data to define the pool may not even be legally permissible. *See People v. Contreras*, 411 P.3d 445, 450 (Cal. 2018) ("Although persons of different races and genders are not similarly situated in terms of life expectancy, it seems doubtful that considering such differences in juvenile sentencing would pass constitutional muster."); *Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1069 (Conn. 2015) (Espinosa, J., dissenting) ("Relying on [gender and race] classifications in order to determine whether a given sentence violates the eighth

amendment suggests that a Caucasian girl should be treated differently than an African-American boy.").

And once the proper pool of people is determined and the average life expectancy of that pool is calculated, the impact of prison lurks as a further complicating factor. Some studies indicate that prison shortens a person's life expectancy. *See, e.g.*, Evelyn Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989–2003*, 103 Am. J. Pub. Health 523, 523 (2013), https://perma.cc/G44S-HGX6; Adele Cummings, Stacie Nelson Colling, *There Is No Meaningful Opportunity in Meaningless Data: Why It Is Unconstitutional to Use Life Expectancy Tables in Post-Graham Sentences*, 18 U.C. Davis J. Juv. L. & Pol'y 267, 288 (2014). But others suggest that for some disadvantaged populations, prison can increase life expectancy. *See* Evelyn Patterson, *Incarcerating Death: Mortality in U.S. State Correctional Facilities, 1985–1988*, 47(3) Demography 563, 594–99 (2010); *see also Contreras*, 411 P.3d at 450 (citing two studies); *Casiano*, 115 A.3d at 1069 (Espinosa, J., dissenting). And even granting that prison does reduce life expectancy, yet another difficult question arises: "By how much?"

Kitchen does not address any of these issues. Nor has he provided the Court with any peer-reviewed studies or expert reports that would allow an accurate assessment of his life expectancy. But the Court acknowledges that Kitchen is without counsel and has limited ability to conduct research from prison; so the Court has reviewed some of the studies that other courts have used to determine life-expectancy. None clearly show that more likely than not, Kitchen's life expectancy is less than 59 years. *See Glowco*, 958 F.3d at 539 (providing that a preliminary injunction should be awarded only if "the movant, *by a clear showing*, carries the burden of persuasion").

Some courts looked at data from the Centers for Disease Control and Prevention. *E.g.*, *Casiano*, 115 A.3d at 1046; *see also Starks v. Easterling*, 659 F. App'x 277, 282 (6th Cir. 2016)

(White, J., concurring). The CDC provides that men born in 1970 (when Kitchen was born) were, at the time of their birth, expected to live to age 67. *See* Elizabeth Arias & Jiaquan Xu, United States Life Tables, 2017, 68 Nat'l Vital Stat. Reps., no. 7, June 24, 2019 at Table 19, https://perma.cc/7KY9-GH4E. True, the CDC also provides that African-American males born in 1970 were, at birth, expected to live to only age 60. *Id.* That data point makes Kitchen's parole review at age 59 constitutionally significant. But the same CDC report also indicates that an African-American man who has survived to Kitchen's age of 50 is expected to live about another 27 years, i.e., until about 77 years old. *See id.* at Table A. So, depending on the interpretation of the CDC data, it favors or disfavors Kitchen's position. And Kitchen has not shown that one interpretation is more proper than the other.

Several courts have referenced a study by Deborah Labelle titled "Michigan Life Expectancy Data for Youth Serving Natural Life Sentences." *See e.g., Sen v. State*, 390 P.3d 769, 776 n.5 (Wyo. 2017); *Casiano*, 115 A.3d at 1046; *see also Buffer*, 137 N.E.3d at 778 (Burke, J., concurring). The study states, "Looking at Michigan youth who were punished with a natural life sentence, the average life expectancy is 50.6 years." *See* Deborah Labelle, *Michigan Life Expectancy Data for Youth Serving Natural Life Sentences* (2013), https://perma.cc/9PSY-3B6Q (last visited April 4, 2019). Accepting that statement as fact also lends considerable support to Kitchen's position—he will be well past 50 years old by the time he is reviewed for parole. But the paper does not describe the methodology used and does not appear to have been subject to peer review. *See* Fed. R. Evid. 702; *see also Casiano*, 115 A.3d at 1070 (Espinosa, J., dissenting) ("I observe that the majority relies on statistics supplied by The Campaign for the Fair Sentencing of Youth, an advocacy group."). The Court thus declines to grant the extraordinary remedy of a preliminary injunction based on Labelle's 50.6-year figure.

At least two courts have referenced in passing a paper by Evelyn Patterson and, in particular, her finding that each year in prison contributes to "a 2-year decline in life expectancy." *See Contreras*, 411 P.3d at 450; *People v. Wines*, 916 N.W.2d 855, 858 n.6 (Mich. Ct. App. 2018). But the people in Patterson's study were parolees. *See* Evelyn Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989–2003*, 103 Am. J. Pub. Health 523, 523 (2013), https://perma.cc/G44S-HGX6. And her one-year-to-two-year finding was based on the probability of death while on parole. *See id.* at 523–24. But the question here is the life expectancy of a juvenile who has not been paroled, i.e., whether Kitchen's parole *review* will occur before the end of his lifespan. So Patterson's statement that one year in prison decreases life expectancy by two years is not directly applicable to Kitchen's *Miller* claim.

\* \* \*

None of the above approaches—*Miller*'s reasoning, the state legislatures' responses to *Miller*, and studies on life expectancy—convincingly show that Kitchen's right to be free from "cruel and unusual punishments" was violated when he was sentenced to a minimum of 42 years in prison without consideration of his youth. And because a preliminary injunction is an "extraordinary and drastic remedy . . . that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Glowco*, 958 F.3d at 539, the Court cannot grant Kitchen preliminary relief on his *Miller* claim.

### E.

The Court next explores the *Graham* path.

Recall that in *Graham*, the Supreme Court prohibited states from deciding "at the outset" that a juvenile offender who did not kill should spend his entire life in prison. 560 U.S. at 75. To the contrary, under *Graham*, states "must" give juvenile nonhomicide offenders like Kitchen

"some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.*

The Court is not aware of any binding interpretation of this "meaningful opportunity" mandate.

*Graham* itself does not define "meaningful opportunity to obtain release." *See Graham*, 560 U.S. at 123 (Thomas, J., dissenting) ("[W]hat, exactly, does such a 'meaningful' opportunity entail? When must it occur? . . . The Court provides no answers to these questions, which will no doubt embroil the courts for years."); *State v. Smith*, 892 N.W.2d 52, 65 (Neb. 2017) ("[T]he U.S. Supreme Court provided little guidance as to what constitutes a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'").

As for the Sixth Circuit, the Court of Appeals has remarked that parole review after 42 to 45 years in prison does not run afoul of *Graham*. *See Goins v. Smith*, 556 F. App'x 434, 440 (6th Cir. 2014). But the remark is not only found in an unpublished opinion, it is dicta. In a prior decision, *Bunch v. Smith*, the Sixth Circuit held it was not unreasonable for a state court to read *Graham* as not extending to multiple, consecutive term-of-year sentences. And in *Goins*, a state court had again read *Graham* as not extending to multiple, consecutive term-of-year sentences. So the Sixth Circuit held that "*Bunch* is controlling." *See* 556 F. App'x at 440. Only then did the Court of Appeals add, "[E]ven if we were to apply *Graham* to Goins's consecutive, fixed-term sentence for multiple offenses, the district court correctly observed that Goins's meaningful opportunity for parole renders *Graham* inapplicable." *Id.*

So the scope of *Graham*'s "meaningful opportunity" mandate is an open question for this Court.

One interpretation of that mandate is that states must review a juvenile nonhomicide offender for parole once he has served an amount of time that, in all likelihood, suffices to show "maturity and rehabilitation." After all, if a still-malleable 17-year-old cannot show rehabilitation after serving say, 20 years in prison, is there good reason to think that another 20 years in prison, served as a less-malleable adult, will permit the showing? This may explain why, in the wake of *Graham* and *Miller*, at least a dozen states have given juvenile offenders the right to parole review after serving 15, 20, or 25 years in prison. So one interpretation of *Graham*'s "meaningful opportunity" mandate is that a juvenile nonhomicide offender should be reviewed for parole at the likely-rehabilitated-now-or-likely-rehabilitated-never point in his sentence. *Cf. Ira v. Janecka*, 419 P.3d 161, 170 (N.M. 2018) ("Perhaps evaluating the juvenile's maturity and rehabilitation once the juvenile's brain has presumably developed is the time frame required by the Eighth Amendment[.]").

But this Court has reviewed numerous opinions addressing *Graham* claims, and courts have not interpreted *Graham*'s mandate that way. Instead, courts generally ask whether parole review comes too late in the juvenile offender's life to be a meaningful opportunity for release. *See, e.g., State v. Smith*, 892 N.W.2d 52, 66 (Neb. 2017); *Henry v. State*, 175 So. 3d 675, 679 (Fla. 2015).

But how late is too late? Perhaps parole review just before the end of the juvenile's lifetime is not too late to be a meaningful opportunity for release. *See Henry*, 175 So. 3d at 680 (interpreting *Graham* to require an opportunity for release within offenders' "natural lives"). But many courts have interpreted *Graham* as requiring an opportunity for release *years before* the end of the offender's lifetime. *See, e.g., People v. Contreras*, 411 P.3d 445, 454 (Cal. 2018) ("[T]he language of *Graham* suggests that the high court envisioned more than the mere act of release or a de

minimis quantum of time outside of prison. *Graham* spoke of the chance to rejoin society in qualitative terms[.]"); *State v. Moore*, 76 N.E.3d 1127, 1137 (Ohio 2016) ("[I]t is clear that the [Supreme Court] intended more than to simply allow juveniles-turned-nonagenarians the opportunity to breathe their last breaths as free people. The intent was not to eventually allow juvenile offenders the opportunity to leave prison in order to die but to live part of their lives in society."); *Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1047 (Conn. 2015) ("The United States Supreme Court . . . . implicitly endorsed the notion that an individual is effectively incarcerated for 'life' if he will have no opportunity to . . . have any meaningful life outside of prison."); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) ("The prospect of geriatric release . . . does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*.").

The Court need not decide whether *Graham* requires parole review just before death or a significant number of years before death. Either way, Kitchen has not shown that he would not have a significant number of years outside prison if he were released on parole at age 59. (The Court again assumes that Kitchen's parole review will be at age 59 because, as with Kitchen's *Miller* claim, the later the review, the stronger the claim.)

Courts have used various approaches to decide whether a juvenile offender's parole review affords him a real opportunity for a life outside prison.

One approach that courts have used is to compare the offender's potential release date against the offender's life expectancy. *See Casiano*, 115 A.3d at 1046. But as discussed, Kitchen has not provided the Court with any compelling evidence that he will not live well into his 60s or 70s.

As for the three studies this Court independently reviewed and discussed above, the Court has explained that it is not yet convinced that LaBelle's life expectancy of 50.6 years is wholly reliable. As for the CDC data, the Court has explained that it can be interpreted in more than one way. On the one hand, an African American man born in 1970 was, at birth, expected to live to only 60 years old; on the other hand, an African American male who has reached Kitchen's age of 50 is expected to live to until age 77. The latter figure means that if Kitchen's first parole review is at age 59, his opportunity for release would come 18 years before he is expected to die. That would be a "meaningful opportunity" even under a reading of *Graham* that includes time to reintegrate into society.

But what about Patterson's dose-response study? Because (under this Court's assumption) *Graham* is concerned about providing juvenile offenders an opportunity for a life outside of prison, Patterson's finding that a *parolee's* life expectancy decreased by two years for each year spent in prison may be more relevant to a *Graham* claim than a *Miller* claim. Even so, Patterson did not show that her one-year-for-two-year rule held indefinitely. *See* Patterson, *Dose-Response*, *supra*, at 525 (providing a hazard function suggesting that that probability of death did not continue to increase with prison time). Indeed, over 90% of the people in her study were imprisoned for five years or less. So absent briefing from the parties on Patterson's study, it is difficult to use that study to estimate how much—5 years, 10 years, more?—Kitchen's life expectancy has been shortened by the effects of prison. Further, a different study by Patterson suggests that African-American males may have a longer life expectancy inside prison than outside prison. *See* Patterson, *Incarcerating Death*, *supra*, at 601.

In short, the evidence of Kitchen's life expectancy now before the Court does not strongly show that parole review at age 59 fails to afford Kitchen a meaningful opportunity for a post-prison life.

A second approach to *Graham* is to provide an opportunity for release by retirement age (presumptively age 65). *See United States v. Grant*, 887 F.3d 131 (3d Cir. 2018). But that approach has been vacated pending an en banc decision. 905 F.3d 285 (3d Cir. 2018). In any event, Kitchen's parole review comes at age 59, seven years before the typical retirement age.

The California Supreme Court approached *Graham*'s "meaningful opportunity for release" mandate in yet a third way. *See Contreras*, 411 P.3d at 454–56. Rejecting a life-expectancy approach, the court instead focused on the words the Supreme Court used in *Graham*, the rationale supporting *Graham*'s holding, decisions by other courts addressing *Graham* claims, and the legislative response to *Graham*. *See id.* at 454–56. In particular, the California Supreme Court found that *Graham*'s language and rationale applied equally to a life-without-parole sentence and a 50-year-without-parole sentence, that no court had found that sentencing a juvenile to 50 years without parole complied with *Graham*'s mandate for a "meaningful opportunity for release," and that many state legislatures had permitted juvenile offenders to be reviewed for parole well before 50 years in prison. *See id.*

The *Contreras* approach also does not warrant a preliminary injunction.

The words the Supreme Court used in *Graham* and the rationale supporting *Graham*'s holding do not provide much insight into whether parole review at age 59 is a "meaningful opportunity for release." To be sure, the Supreme Court referenced "the right to reenter the community" and a "chance for reconciliation with society." *Graham*, 560 U.S. at 74, 79. But the Supreme Court gave no guidance on how much time a juvenile offender should have to

23

"reconcil[e] with society" and "reenter the community." The *Contreras* court thought that release at age 66 offered too little time, but Kitchen's parole review will come at age 59.

As for the California Supreme Court's statement that "we are not aware of any state high court that has found incarceration of a juvenile for 50 years or more before parole eligibility to fall outside the strictures of *Graham*," *Contreras,* 411 P.3d at 455, Kitchen's sentence is shorter, 42 years before parole eligibility. And courts have found that length of time without release or parole review to be consistent with *Graham*'s "meaningful opportunity" mandate. *See United States v. Mathurin*, 868 F.3d 921, 935–36 (11th Cir. 2017) (finding that with good-time credits, juvenile offender could be released after 43 years in prison, which complied with *Graham*); *Ira v. Janecka*, 419 P.3d 161, 170 (N.M. 2018) (finding that 46 years before parole review (barely) complied with *Graham*); *cf. State v. Smith*, 892 N.W.2d 52, 66 (Neb. 2017) (finding that parole eligibility at age 62, 46 years after the defendant had pled guilty, comports with *Graham*).

As for the *Contreras* court's reliance on legislative responses to *Graham* and *Miller*, the Court has already explained that state legislatures may have gone beyond what the Eighth Amendment demands in providing for parole review after 15, 20, or 25 years in prison.

So the *Contreras* approach does not warrant preliminary injunctive relief, either.

\* \* \*

Again, Kitchen must carry a considerable burden to obtain preliminary relief. *Glowco*, 958 F.3d at 539. Having considered the different approaches that courts have used to analyze claims pursuant to *Graham*, none clearly show that parole review after 42 years in prison, at age 59, is not a "meaningful opportunity to obtain release based on demonstrated maturity and

rehabilitation," *Graham*, 560 U.S. at 75. So Kitchen is not entitled to a preliminary injunction based on *Graham*.

**F.**

The Court so far has not discussed Kitchen's claim under Article I, § 16 of the Michigan Constitution. Section 16's disjunctive "cruel or unusual punishment" language is arguably broader than the Eighth Amendment's conjunctive "cruel and unusual punishments" language. *See People v. Bullock*, 485 N.W.2d 866, 872 (Mich. 1992) (noting that the "textual difference does not appear to be accidental or inadvertent" and finding punishment "cruel or unusual" under the Michigan Constitution even though the U.S. Supreme Court had found the same punishment permissible under the Eighth Amendment); *but cf. People v. Carp*, 852 N.W.2d 801, 846 (Mich. 2014) (finding that Article 1, § 16 did not categorically prohibit sentencing juvenile homicide offenders to life without parole), *vacated on other grounds by Carp v. Michigan*, 136 S. Ct. 1355 (2016). And in addition to the textual difference, an intermediate-level state court has found that Michigan law requires a judge to consider the mitigating qualities of youth before sentencing a juvenile offender to 40 years without parole even though the Eighth Amendment does not. *People v. Wines*, 916 N.W.2d 855, 859 (Mich. Ct. App. 2018), *appeal held in abeyance by People v. Wines*, 924 N.W.2d 589 (Mich. 2019).

That said, Kitchen has not treated his claim under the Michigan Constitution any differently from his claim under the United States Constitution. (*See* ECF No. 51, PageID.349; ECF No. 50, PageID.289.) In his complaint and motion, Kitchen always references the Eighth Amendment and Article 1, § 16 in tandem. He makes no reference to any textual difference. Nor does he provide any reason why Article 1, § 16 would prohibit sentencing a juvenile to 42 years without parole without accounting for youth or would require parole review before 42 years, but the Eighth

25

Amendment would not. As for *Wines*, its holding that judges must consider youth before sentencing a juvenile offender to 40 years without parole was not based on Article I, § 16; the opinion nowhere mentions Michigan's "cruel or unusual punishment" clause. As such, Kitchen has also not carried his burden of showing that the Michigan Constitution warrants preliminary relief.

**G.**

As noted, Kitchen also seeks preliminary relief under the substantive component of the Due Process Clause. But, as explained below, the Court will grant Defendants' motion to dismiss Kitchen's substantive due process claim.

**H.**

Before turning to Defendants' motion to dismiss, there is one last issue to address.

Although Kitchen primarily claims that the laws equating his earliest parole date with the end of his minimum sentence are unconstitutional, he also challenges the process used to grant or deny parole. In particular, Kitchen alleges that the mitigating qualities of youth are not factored into the decision to grant or deny parole. (*See* ECF No. 51, PageID.343.) Kitchen also claims that the parole board is biased against juvenile offenders. (ECF No. 51, PageID.342–343.)

Kitchen's challenge to the parole board's decision-making process is not yet ripe. "A claim is unripe when it is anchored in future events that may not occur as anticipated, or at all," *Jackson v. City of Cleveland*, 925 F.3d 793, 807 (6th Cir. 2019) (internal quotation marks omitted); or, examining the other side of the ripeness coin, "a claim is ripe where it is fit for judicial decision and where withholding court consideration will cause hardship to the parties," *Hill v. Snyder*, 878 F.3d 193, 213 (6th Cir. 2017). Absent intervention by this Court (and, as just explained, the Court will not now intervene), Kitchen will not be eligible for parole until December 2026—more than

26

six years from now. So withholding judgment on whether the parole board adequately considers the mitigating qualities of youth in making its decisions will not yet "cause hardship to" Kitchen. *See Hill*, 878 F.3d at 213. And it may well be that when Kitchen starts the parole-review process in about six years, his youth will be properly factored into the parole decision. Indeed, the current chairperson of the parole board has averred, "the Parole Board will specifically consider an individual's age at the time of the commission of their offense(s) as a factor when determining whether or not that individual should be paroled." (ECF No. 56-3, PageID.441.) And in six years, the alleged bias against juvenile offenders might have been eliminated. So Kitchen's concern is "anchored in future events that may not occur as anticipated, or at all," *Jackson*, 925 F.3d at 807.

Accordingly, Kitchen's claims that the parole board does not adequately consider youth in deciding whether to grant parole and is biased against juvenile offenders are not yet ripe. Article III of the Constitution thus precludes this Court from considering those challenges now.

## III.

Having addressed Kitchen's motion for preliminary relief, the Court turns to Defendants' motion to dismiss pursuant to Rule 12(b)(6). (ECF No. 55.)

### A.

In deciding a Rule 12(b)(6) motion, the Court construes Kitchen's second amended complaint "in the light most favorable" to him and determines whether it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

**B.**

The Court starts with Defendants' assertion that Kitchen's claim under the Equal Protection Clause is not plausible. (ECF No. 55, PageID.377.)

According to Kitchen's complaint, reports published by the FBI in the 1980s misled politicians and the public into thinking that "a wave of youth violence was coming." (ECF No. 51, PageID.338.) Michigan governors thus "ran on a platform of get[ting] tough on youths" and the judge that sentenced him, Judge Kuhn, "aligned his campaign" with "get[ting] tough on youth crime." (ECF No. 51, PageID.339.) Kitchen alleges that as a result of the crackdown on juvenile crime, juvenile offenders, including him, "received on average harsher criminal sentences than adult offenders for similar crimes." (ECF No. 51, PageID.340.) Although this case is not about disparate sentencing practices, Kitchen ties disparate sentencing to disparate parole-eligibility dates. (*See* ECF No. 59, PageID.497.) Because the parole-eligibility laws he challenges equate the end of the minimum sentence with the earliest parole date, disparate sentencing results in the parole-eligibility laws having a disparate impact on juveniles. (*See id.*)

Kitchen's allegations are too general and conclusory to make it reasonable to infer that his earliest parole date is the product of intentional, disparate treatment in violation of the Equal Protection Clause. *See Arsan v. Keller*, 784 F. App'x 900, 912 (6th Cir. 2019) ("The threshold element of an equal protection claim is disparate treatment and only intentional, purposeful discrimination violates the equal protection clause." (quotation marks and citation omitted)).

To start, Kitchen has not pled that the parole-eligibility laws he challenges were enacted with an intent to discriminate against juvenile offenders. And it is doubtful he could. The laws are facially neutral. And the Michigan legislature equated parole eligibility with the end of the minimum sentence before the 1980s, when Kitchen alleges that the tough-on-youth-crime

movement began. *See People ex rel. Oakland Cty. Prosecuting Attorney v. State Bureau of Pardons & Paroles*, 259 N.W.2d 385, 388 (Mich. Ct. App. 1977) (quoting version of parole-eligibility statute in effect in 1977).

True, Kitchen alleges that Defendants have since learned that the parole-eligibility laws have a disparate impact on juveniles but continue to enforce them. But Kitchen's allegations of Defendants' knowledge of a disparate impact are conclusory. Without elaboration, he simply says that Defendants "know[]" that the parole-eligibility laws have a disparate impact on juveniles. (*See* ECF No. 51, PageID.345–346.) But how do Defendants, who took office *decades* after minimum sentences were equated with parole eligibility, know this? Kitchen does not say. *See League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) ("The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief."). Moreover, it is doubtful that establishing that Defendants continue to enforce the parole-eligibility laws while knowing that they have a disparate impact on juveniles states an equal-protection claim. *See United States v. Blewett*, 746 F.3d 647, 659 (6th Cir. 2013) (en banc) ("A disproportionate effect does not violate the Equal Protection Clause, even if it was foreseen. The Supreme Court has instructed us that the 'intent' in 'intentional discrimination' means more than 'intent as awareness of consequences.'" (citation omitted)).

For all of these reasons, the Court finds that Kitchen equal-protection claim is not plausible.

## C.

Defendants also seek dismissal of Kitchen's claim that the parole-eligibility laws violate the Due Process Clause. (ECF No. 55, PageID.379.)

Kitchen's substantive due process claim is really two. First, Kitchen argues that *Graham* granted juvenile offenders a liberty interest in a "meaningful opportunity to obtain release" that is

protected by the Due Process Clause. (ECF No. 51, PageID.347; ECF No. 50, PageID.289–290; ECF No. 59, PageID.503.) This theory has some support in the case law. *Flores v. Stanford*, No. 18-2468, 2019 WL 4572703, at \*10 (S.D.N.Y. Sept. 20, 2019) ("*Graham*, *Miller*, and *Montgomery* . . . confer on juvenile offenders a constitutionally protected 'liberty interest in a meaningful parole review.'" (quoting *Brown v. Precythe*, No. 17- 04082, 2017 WL 4980872, at \*12 (W.D. Mo. Oct. 31, 2017))). Second, Kitchen argues that requiring a juvenile offender to spend a minimum of 42 years in prison before parole review "shocks the conscience," especially in comparison to the time similarly situated adult offenders must serve in prison before their first parole review. (ECF No. 51, PageID.348; ECF No. 59, PageID.502.)

Kitchen's claims under the Due Process Clause are not plausible. Because the Eighth Amendment expressly addresses Kitchen's concern about his earliest parole date, the Due Process Clause should not be read to provide yet another avenue for relief. The Eighth Amendment's prohibition of cruel and unusual punishment already "guarantees individuals the right not to be subjected to excessive sanctions." *See Miller*, 567 U.S. at 469 (internal citation and quotation marks omitted). Indeed, the "meaningful opportunity to obtain release" language that purportedly creates a liberty interest stems from the Eighth Amendment. *Graham*, 560 U.S. at 75. As for Kitchen's claim that his long prison term before parole consideration is "conscience shocking," that is just another way to say that his sentence is too harsh given his lessened culpability and greater ability for reform. Yet the Supreme Court has addressed that type of claim under the Eighth Amendment. *See Miller*, 567 U.S. at 471 ("Because juveniles have diminished culpability and greater prospects for reform . . . they are less deserving of the most severe punishments." (internal quotation marks omitted)); *Montgomery*, 136 S. Ct. at 733 ("*Miller* recognized that the distinctive attributes of youth diminish the penological justifications for imposing life without parole on

juvenile offenders" (internal quotation marks omitted)). Since the Eighth Amendment explicitly speaks to Kitchen's concerns about how long he must spend in prison before parole review, Kitchen cannot invoke the implicit protections of the Due Process Clause. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (internal quotation marks omitted)); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ("[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

## IV.

Before concluding, the Court notes that it understands why Kitchen believes his situation is unfair. Kitchen committed serious crimes, to be sure. But 42 years in prison without parole (and possibly 60 years in all) is a very harsh punishment for someone who was still a child in the eyes of the law when he offended. Kitchen is now 50 years old, and he has spent every day of his adult life in prison. To this Court's knowledge, he has not had a career, been married, or had children. And no matter how much Kitchen has changed for the better, he will not be reviewed for parole for at least another six years; he will be 57 by then. And the parole board might not even release him at that time. The U.S. Supreme Court says that youth matters when imposing punishment; the Michigan Court of Appeals says that a judge abuses his discretion if he requires a juvenile offender to spend 40 years in prison without first considering the offender's youth; yet, Kitchen's immaturity and ability for reform have never been factored into his prison term.

While the Court recognizes these circumstances, it has a duty to hold parties to their burdens of poof and to apply the governing law. Here, fulfilling that duty means that the Court must DENY Kitchen's motion for a preliminary injunction (ECF No. 50). Further, Defendants' motion to dismiss (ECF No. 55) is GRANTED. Remaining in this case are Kitchen's claims under the Eighth Amendment and Article 1, § 16 of the Michigan Constitution. The Court will appoint counsel to represent Kitchen as the case goes forward. And if neither side takes the opportunity to appeal the Court's ruling on the injunction motion, *see* 28 U.S.C. § 1292(a), the Court will schedule a scheduling conference after new counsel has an opportunity to get up to speed.

SO ORDERED.

Dated: September 11, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 11, 2020.

s/Erica Karhoff
Case Manager to the
Honorable Laurie J. Michelson