UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL KITCHEN,

      Plaintiff,

v.

GRETCHEN WHITMER,
HEIDI WASHINGTON, and
BRIAN SHIPMAN,

      Defendants.

Case No. 18-11430
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [95] AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [94]**

---

Michael Kitchen is 52 years old; he has spent every day of his adult life in prison. As a juvenile, Kitchen committed serious, but nonhomicide, crimes. For his crimes, he was sentenced to a minimum of 42 years in prison (and a maximum of 60 years). Under Michigan's parole-eligibility laws, an offender cannot be evaluated for parole until he completes his minimum sentence (less disciplinary credits). In Kitchen's case, that means he will not be evaluated for parole until he is almost 58 years old. And according to the only expert in this case, Kitchen is unlikely to live past his early sixties.

In *Graham v. Florida*, the Supreme Court held that the Constitution prohibits states from sentencing juvenile, nonhomicide offenders to life in prison without the possibility of parole. The Supreme Court added, "A State is not required to guarantee

eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State *must* do, however, is give defendants like Graham some *meaningful* opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. 48, 75 (2010) (emphases added).

Based on the limited record before the Court, denying Kitchen parole review until he is nearly 58 years old runs afoul of *Graham*'s meaningful-opportunity mandate. As noted, an expert has opined that Kitchen will most likely die in his early 60s. That expert testimony has not been challenged as unreliable, and the record includes no rebuttal opinion. Accordingly, by the time Kitchen is first evaluated for parole, he will likely have only four or five years to live. And, in this Court's opinion and that of others, an opportunity for release at the very twilight of life is not a "meaningful" one under *Graham*. *See e.g.*, *People v. Contreras*, 411 P.3d 445, 453–54 (Cal. 2018) ("[T]he language of *Graham* suggests that the high court envisioned more than the mere act of release or a *de minimis* quantum of time outside of prison. *Graham* spoke of the chance to rejoin society in qualitative terms."). For these reasons and those set out below, the Court finds that Michigan's parole-eligibility laws as applied to Kitchen violate *Graham*'s meaningful-opportunity mandate. It follows that those laws are unconstitutional as applied to Kitchen.

## I.

## A.

In 1987, Kitchen was convicted of several crimes. Kitchen and two others entered a couple's home and robbed them. (ECF No. 1, PageID.8.) During the robbery,

one of the robbers digitally penetrated the female victim. (ECF No. 1, PageID.9.) Kitchen pled guilty to armed robbery and other charges but went to trial on one charge of first-degree criminal sexual conduct and charges of possessing a firearm during a felony. (ECF No. 78, PageID.688–689.) A jury found Kitchen guilty. At the time of the home invasion, Kitchen was 17 years old.

At Kitchen's sentencing, Oakland County Circuit Court Judge Richard D. Kuhn varied upward from the guidelines range. (ECF No. 78, PageID.689.) Judge Kuhn stated, "this is one of the most heinous crimes that [he] had presided over." (ECF No. 95-2, PageID.1027.) He further indicated that in formulating Kitchen's sentence, he had considered "disciplin[e]," "punishment," "protection of society," and "deterring of others." (ECF No. 95-2, PageID.1028.) Without a word about how Kitchen's youth did or did not mitigate a lengthy sentence, Judge Kuhn sentenced Kitchen to a minimum of 40 years in prison (and up to 60 years) for the criminal-sexual-conduct conviction and a consecutive two-year term for the felony-firearm convictions. (ECF No. 95-2, PageID.1027.) Thus, Kitchen was to spend a minimum of 42 years (less credits for good behavior) in prison. Restated, absent credits for good behavior, the first time 17-year-old Kitchen would appear before the parole board for possible release would be when he was 59 years old.

## B.

Between 2010 and 2016, the Supreme Court decided three cases where juvenile offenders claimed that their sentences of life without parole amounted to "cruel and unusual punishment[]" prohibited by the Eighth Amendment of the Constitution.

In *Graham v. Florida*, Terrance Graham was sentenced to life in prison without the possibility of parole for committing nonhomicide offenses at age 17. 560 U.S. 48, 54–55 (2010). The Supreme Court explained that, on the one hand, a life-without-parole sentence "gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope," *id.* at 79; it is an "irrevocable judgment about [the offender's] value and place in society," *id.* at 74. Yet, on the other hand, a juvenile's immaturity not only makes him or her less blameworthy than an adult, it also makes him or her more amenable to rehabilitation than an adult. *See id.* at 68–69. And even if some juvenile offenders were truly incorrigible, a sentencer would have difficulty distinguishing that rare juvenile "from the many that have the capacity for change." *Id.* at 77.

Because life without parole would usually be a disproportionate penalty for a nonhomicide offense committed by a juvenile, and because the exceptional cases could not be reliably identified, and for still other reasons, the Supreme Court created a categorical rule. *Graham*, 560 U.S. at 74, 77–78. The Court held that a State cannot sentence a juvenile, nonhomicide offender to life in prison without the possibility of parole. *Id.* at 75. While the "Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life," "[i]t does prohibit States from making the judgment at the outset." *Id.* Thus, States "must" give "defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.*

Two years later, the Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012). There, two juveniles had committed homicide and their states mandated life without parole for their offenses, i.e., that punishment automatically followed from the homicide convictions. Building on *Graham* and again recognizing a juvenile's "diminished culpability" and "greater prospects for reform," *id.* at 471, the Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," *id.* at 479. While juvenile, homicide offenders could still be sentenced to life without parole, that sentence could not be automatic upon conviction; instead a sentencer needed "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

In *Montgomery v. Louisiana*, the Court held that because *Miller* established a new, substantive rule of constitutional law, it applied retroactively. 577 U.S. 190, 206 (2016). Thus, even juvenile offenders whose convictions were final when *Miller* was decided could not be required to serve a mandatory, life-without-parole sentence.

## C.

In 2018, Kitchen filed this lawsuit pro se; at that time, Kitchen was 48 years old and had spent the prior 31 years in prison.

This case had a number of threshold motions, including two motions to dismiss. Because this case survived those motions, and because it would have been difficult for a pro se prisoner to litigate a case of this type, the Court appointed counsel to represent Kitchen.

Following the appointment of the Troutman Pepper law firm, Kitchen filed a third-amended complaint. Kitchen named three defendants: Michigan Governor Gretchen Whitmer, Michigan Department of Corrections Director Heidi Washington, and Chairperson of the Michigan Parole Board Brian Shipman. (ECF No. 78, PageID.688.) Although this latest complaint has only two counts, it sets forth three claims for relief.

For one, Kitchen brings a claim under *Graham*. He points out that in *Graham*, the Supreme Court held that the Eighth Amendment prohibits sentencing a juvenile, nonhomicide offender to life without parole. (ECF No. 78, PageID.693.) And, says Kitchen, given the aging effects of decades spent in prison, his 42-years-without-parole sentence is the "functional equivalent" of a life-without-parole sentence. (*See id.*) Kitchen additionally relies on *Graham*'s requirement that the States give juvenile, nonhomicide offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." In particular, he claims that even if he outlives his 42-year minimum sentence by a few years, "he will be deprived of any meaningful opportunity for life outside of prison, such as the ability to have children, receive an education, or pursue a career." (ECF No. 78, PageID.694.)

Kitchen also brings a claim under *Miller*. Kitchen alleges that during his sentencing, "Judge Kuhn did not take into account how children such as [him] are different, and why that difference would counsel against condemning him to a functional life sentence in prison." (ECF No. 78, PageID.695.)

Kitchen's final claim is under the Michigan Constitution's cruel "or" unusual punishments clause. (ECF No. 78, PageID.695.) In Kitchen's view, his sentence is "unusually excessive and disproportionate" and thus violates the Michigan Constitution. (ECF No. 78, PageID.697.)

As relief for these three claims, Kitchen does not seek a shorter sentence. Nor does he seek a resentencing. Instead, Kitchen asks that this Court declare that Michigan Compiled Laws § 791.234(1) is unconstitutional as applied to him. (ECF No. 78, PageID.697.) Briefly, § 791.234(1) provides that a prisoner "is subject to the jurisdiction of the parole board when the prisoner has served a period of time equal to the minimum sentence imposed by the court for the crime of which he or she was convicted, less good time and disciplinary credits, if applicable." In Kitchen's view, because this statute prevents him from even being considered for parole until he spends 42 years in prison, the enforcement of § 791.234(1) against him is contrary to *Graham*, *Miller*, and the Michigan Constitution. If he prevails in showing that § 791.234(1) is unconstitutional as applied to him, Kitchen requests an immediate hearing before the parole board. To be clear, Kitchen does not seek release from prison, only that the parole board evaluate him for release.

The parties have completed discovery, and both sides seek summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II.

Even when both sides move for summary judgment, courts in the Sixth Circuit do not assume that the parties have consented to resolution of the case on the

summary-judgment record. *See Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021). But, as this Court noted in a separate order (ECF No. 103), this is not merely a case involving cross motions for summary judgment. Here, the record is limited, there is no evidence that rebuts the key opinion evidence, and, because this case will not be tried to a jury, this Court is the finder of fact.

As such, the Court asked if the parties were amenable to a "case stated" approach where the Court would decide the claims on the summary-judgment record. *See Hartford Cas. Ins. Co. v. Ewan*, 890 F. Supp. 2d 886, 890 (W.D. Tenn. 2012); *Hartford Cas. Ins. Co. v. Ewan*, 536 F. App'x 553, 555 (6th Cir. 2013). The parties have indicated that they are not amenable to a case-stated approach. (ECF No. 104.)

Accordingly, the Court will "evaluat[e] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Redbubble*, 989 F.3d at 442 (internal quotation marks omitted).

### III.

### A.

The Court begins with Kitchen's claim under *Miller*.

### 1.

Although Defendants believe this claim fails on the merits, they also say this Court need not reach the merits. According to Defendants, Kitchen lacks Article III standing to pursue a claim under *Miller*. Article III standing demands that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

*Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020). Defendants argue that Kitchen cannot satisfy any of these three elements.

The Court agrees with Defendants to this extent: Kitchen's injury is not fairly traceable to their conduct.

A good starting point for a standing analysis is *Miller* itself. As explained above, *Miller* established a substantive rule of constitutional law because, except for the rare, incorrigible juvenile, *Miller* categorically prohibited mandatory life-without-parole sentences for juvenile offenders. *Montgomery*, 577 U.S. at 209. But "*Miller*'s holding has a procedural component." *Id.* In particular, "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at 209–10; *see also Miller*, 567 U.S.  at 483.

It is this procedural component of *Miller* that Kitchen claims was violated. Kitchen's complaint alleges, "During . . . sentencing, Judge Kuhn did not take into account how children such as Mr. Kitchen are different, and why that difference would counsel against condemning him to a functional life sentence in prison." (ECF No. 78, PageID.695.) According to Kitchen, "Judge Kuhn's failure to consider Mr. Kitchen's youth violates the Eighth Amendment, as stated in *Miller*." (*Id.*) And Kitchen's summary-judgment motion is to the same effect: "given that Judge Kuhn failed to account for Mr. Kitchen's youth at sentencing in the manner contemplated by *Miller*, the only remaining issue is whether Mr. Kitchen's 42 year sentence before

parole eligibility constitutes a de facto life sentence, such that the protections under *Miller* are triggered." (ECF No. 94, PageID.831.)

Given that Kitchen's *Miller* claim is based on that decision's "procedural component," *see* 577 U.S. at 209, it follows that if anyone caused a *Miller* injury, it was Judge Kuhn. Not only does Kitchen himself fault Judge Kuhn (ECF No. 78, PageID.695), *Miller* makes clear that it is the "sentencer" who must consider the mitigating aspects of youth. *Miller*, 567 U.S. at 477 ("a *sentencer* misses too much if he treats every child as an adult" (emphasis added)); id. at 479 ("a *sentencer* needed to examine all these circumstances" (emphasis added)); *id.* at 480 ("Although we do not foreclose a *sentencer*'s ability to [impose life without parole] in homicide cases, we require it to take into account how children are different" (emphasis added)). *Montgomery* reinforces that point: "*Miller* requires a *sentencer* to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." 577 U.S. at 209–10 (emphasis added).

Here, none of the defendants sentenced Kitchen. And so none of them can be liable for failing to consider the mitigating factors of youth. Kitchen's *Miller* injury is thus not "fairly traceable to the challenged conduct of [any] defendant[.]" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020). It follows that Kitchen does not have Article III standing to pursue a claim under *Miller* against Whitmer, Washington, or Shipman.

**2.**

Even assuming Kitchen has Article III standing to pursue his claim under *Miller* (and further assuming that claim is not, as Defendants argue, barred by the *Rooker-Feldman* doctrine), the claim fails on the merits.

True, this Court previously reviewed the sentencing transcript, noted that Judge Kuhn never once mentioned how juveniles are both less blameworthy and more reformable than adults, and concluded that "Judge Kuhn did not account for Kitchen's youth in the way *Miller* contemplates." *Kitchen v. Whitmer*, 486 F. Supp. 3d 1114, 1120 (E.D. Mich. 2020). Given that Judge Kuhn sentenced Kitchen long before the Supreme Court decided *Miller*, this was a particularly sensible approach. But the Court's take on what Judge Kuhn considered came before the Supreme Court decided *Jones v. Mississippi*, 141 S. Ct. 1307 (2021), a case clarifying *Miller*'s scope.

There, Brett Jones was convicted of killing his grandfather when he was 15 years old, and he was given a mandatory life-without-parole sentence. 141 S. Ct. at 1312. At a post-*Miller* resentencing, Jones' attorney stressed the mitigating factors of youth. *Id.* at 1313. Although the judge acknowledged his discretion to impose something less than life without parole, the judge nonetheless reimposed a life-without-parole sentence. *Id.* Jones appealed. *See id.* at 1313.

Although Jones primarily argued that the sentencing judge needed to make a factual finding that he was incorrigible before imposing life without parole, he alternatively argued that the judge needed to "at least provide an on-the-record sentencing explanation with an 'implicit finding' of permanent incorrigibility." *Jones*,

141 S. Ct. at 1319. In Jones' view, there was a difference between "(i) a sentencer's discretion to consider youth, and (ii) the sentencer's actual consideration of youth." *Id.* The Supreme Court was not convinced: "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth." *Id.* And to reinforce the point: "in a case involving a murderer under 18, a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor." *Id.* at 1319–20.

*Jones* dooms Kitchen's *Miller* claim. Whereas this Court previously inferred that Judge Kuhn did not consider the mitigating factors of youth because he never once mentioned them, *Jones* teaches that the proper inference is the opposite one. Because Kitchen's attorney expressly referred to Kitchen as "a young 17 year old man" at sentencing (ECF No. 55-1, PageID.394), Judge Kuhn was undoubtedly aware that Kitchen was under 18 when he offended. And nothing in Michigan's sentencing scheme deprived Judge Kuhn of discretion to consider Kitchen's youth. Thus, *Miller*'s procedural component was satisfied. *See Jones*, 141 S. Ct. at 1319 ("[I]f the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth[.]"); *Williams v. State*, 500 P.3d 1182, 1185 (Kan. 2021) ("In *Jones*, the Court held that *Miller* does not require a sentencing court to explain on the record how it considered youth[.]").

Resisting this result, Kitchen points to footnote 7 of *Jones*. (ECF No. 99, PageID.1132.) There, the Supreme Court stated, "if a sentencer considering life

12

without parole for a murderer who was under 18 expressly refuses *as a matter of law* to consider the defendant's youth[,] . . . then the defendant might be able to raise an Eighth Amendment claim." *Jones*, 141 S. Ct. at 1320 n.7 (emphasis in original). Kitchen points out that Judge Kuhn expressly stated that he considered the "heinous[ness]" of the crime and the need for "disciplin[e]," "punishment," "protection of society," and "deterring of others," while never mentioning a juvenile's underdeveloped sense of responsibility, vulnerability to negative influences, or heightened ability to reform. (ECF No. 99, PageID.1133.) Apparently invoking the concept of *expressio unios exclusio alterius* (roughly, "to express one is to exclude others"), Kitchen says that Judge Kuhn expressly refused to consider his youth as contemplated in footnote 7 of *Jones*. (*Id.*)

Kitchen reads footnote 7 too broadly. The Supreme Court did not say that a sentencer's mere refusal to consider the mitigating factors of youth suffices for an Eighth Amendment claim—the Court instead emphasized refusal "*as a matter of law.*" *Jones*, 141 S. Ct. at 1320 n.7 (emphasis in original). In fact, footnote 7 relied on *Eddings v. Oklahoma*, where the sentencing judge believed that if he "follow[ed] the law" he could not consider certain mitigating evidence. 455 U.S. 104, 109 (1982).

Here, the Court is not aware of any law that Judge Kuhn relied on that prevented him from considering Kitchen's youth or any mitigating aspect of youth. And while it appears that it was mandatory for the felony-firearm sentences to be consecutive to the criminal-sexual-conduct sentence (ECF No. 55-1, PageID.398), the law did not mandate a 40-year sentence for the criminal-sexual-conduct offense, see

2002 Mich. Legis. Serv. P.A. 714 (S.B. 1127) (amending 1983 version of statute but leaving punishment of life or "any term of years" unaltered). Thus, even if Judge Kuhn did refuse to consider Kitchen's youth when sentencing Kitchen, he did not refuse to consider Kitchen's youth *as a matter of law*.

Kitchen cites *Harned v. Amsberry*, 499 P.3d 825 (Or. Ct. App. 2021), in support of his broader reading of *Jones*' footnote 7. There, the Oregon appellate court noted that because footnote 7 described one situation where a juvenile might have a *Miller* claim, a juvenile's life-without-parole sentence might be reversed "in other similar situations where the record affirmatively reflects the sentencer's refusal to consider youth." *Id.* at 832–33. But in the case before it, the sentencing judge did consider the petitioner's youth. *Id.* at 833. So the "other similar situations" reasoning was dicta.

\* \* \*

In sum, Kitchen's claim under *Miller* is based on that decision's "procedural component," and thus, the blameworthy party, if anyone, is the person who sentenced Kitchen. None of the named defendants sentenced Kitchen. So Kitchen lacks Article III standing to pursue his *Miller* claim against the named defendants. And even if there were no jurisdictional bars to his *Miller* claim, and even if Kitchen's sentence is the equivalent of a life-without-parole sentence, Judge Kuhn was aware that Kitchen was a juvenile offender and had discretion to consider his youth when determining Kitchen's sentence. So under *Jones*, Kitchen's *Miller* claim fails on the merits.

**B.**

The Court thus turns to Kitchen's claim under *Graham*.

**1.**

As with Kitchen's claim under *Miller*, Defendants argue that Kitchen lacks Article III standing to pursue a claim under *Graham*. As noted, Article III standing demands that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020). Defendants argue that none of these three elements are satisfied. (ECF No. 95, PageID.993–1000.)

The Court disagrees with Defendants.

The Court's explanation for this conclusion starts with a summary of Michigan's indeterminate sentencing scheme. Under Michigan's scheme, the judge sets the minimum term that the offender will spend in prison (here, 42 years), the legislature, through its statutes, sets the maximum prison term (here, 60 years), and the precise amount of time that an offender will spend in prison is left to the executive branch, and more specifically, the parole board. *See Kitchen v. Whitmer*, 486 F. Supp. 3d 1114, 1119 (E.D. Mich. 2020).

A collection of state laws codify this scheme. For instance, one statutory provision limits the role of the judge to imposing just a minimum sentence: "the court imposing sentence shall not fix a definite term of imprisonment, but shall fix a minimum term, except as otherwise provided in this chapter." Mich. Comp. Laws

§ 769.8. Another statute provides that a person convicted of first-degree criminal sexual conduct, "is not eligible for parole until the person has served the minimum term imposed by the court less an allowance for disciplinary credits." Mich. Comp. Laws § 791.233b(w); *see also* Mich. Comp. Laws § 791.233(1)(c) (similar). And § 791.234(1) likewise states, "a prisoner sentenced to an indeterminate sentence . . . is subject to the jurisdiction of the parole board when the prisoner has served a period of time equal to the minimum sentence imposed by the court . . . less . . . disciplinary credits, if applicable."

With that background, now consider Kitchen's claim. Kitchen says that § 791.234(1) (one of the statutes just recited) is unconstitutional as applied to him. (ECF No. 78, PageID.697; ECF No. 94, PageID.834.) While perhaps Kitchen should have more broadly challenged the collection of state statutes and regulations that require a judge to impose a minimum sentence and that limit the parole board's jurisdiction until the completion of that sentence (collectively the "Parole-Eligibility Laws"), his point is that his injury is "fairly traceable" to the parole-board jurisdiction laws and the people who enforce them. (ECF No. 99, PageID.1121.)

The Court agrees with Kitchen on this front. Indeed, if the Parole-Eligibility Laws were different, Kitchen may well have already been considered for parole. Take, just as an example, a former federal scheme. Under that scheme, unless the crime was not eligible for parole, an offender would, in the worst case, be eligible for parole after completing one third of his sentence. *See* 28 C.F.R. § 2.2; *Edwards v. United States*, 574 F.2d 937, 941 (8th Cir. 1978) (summarizing the three ways a judge could

16

sentence an offender and the corresponding parole eligibility); *Garafola v. Benson*, 505 F.2d 1212, 1216–17 (7th Cir. 1974) (same). If Michigan had a scheme like the former federal scheme, even the imposition of a 100-year sentence would have resulted in Kitchen being evaluated for parole after about 33 years in prison. Yet, under Michigan's sentencing scheme, Kitchen is not eligible for parole until after he completes all 42 years of his minimum sentence. So viewed, the Court finds that Kitchen's injuries are "fairly traceable" to Michigan's laws codifying its indeterminate sentencing scheme, and, in particular, the Parole-Eligibility Laws. And because Kitchen has sued parties who are responsible for enforcing those laws, his injury is fairly traceable to Defendants' conduct.

Defendants' contrary arguments are not persuasive.

Regarding the traceability requirement for Article III standing, Defendants say "[t]he cause of Kitchen's injury . . . is the sentencing court's alleged failure to consider the mitigating factors of youth." (ECF No. 95, PageID.997.) Thus, in Defendants' view, Kitchen's injury can be traced to the sentencing judge or the 42-year minimum sentence, not their enforcement of the Parole-Eligibility Laws. (*See id.*)

Defendants focus on one cause while ignoring another. To be sure, Judge Kuhn's 42-year sentence is a but-for cause of Kitchen's injury. Had Judge Kuhn sentenced Kitchen to say, a minimum of 20 years, Kitchen would have been reviewed for parole before *Graham* was even decided. But look at it the other way. Had Michigan's indeterminate sentencing laws not equated parole-board jurisdiction with

17

the end of the minimum sentence, but instead gave the parole board jurisdiction at say, the one-third mark of Kitchen's maximum sentence, Kitchen would also have been reviewed for parole before *Graham* was even decided. In other words, Judge Kuhn's sentence and Defendants' application of Michigan's Parole-Eligibility Laws to that sentence are both causes of Kitchen's injury.

And in *Galaria v. Nationwide Mutual Insurance*, the Sixth Circuit found standing when two independent actors caused the plaintiffs' injuries. There, hackers compromised Nationwide's computers and obtained the plaintiffs' personal information. 663 F. App'x 384, 386 (6th Cir. 2016). But the plaintiffs did not sue the hackers, they sued Nationwide. *Id.* at 385. In addressing Article III standing, the Sixth Circuit explained, "Although hackers are the direct cause of Plaintiffs' injuries, the hackers were able to access Plaintiffs' data only because Nationwide allegedly failed to secure the sensitive personal information entrusted to its custody." *Id.* at 390. "In other words," the Court continued, "but for Nationwide's allegedly lax security, the hackers would not have been able to steal Plaintiffs' data." *Id.* According to the Sixth Circuit, "[t]hese allegations meet the threshold for Article III traceability, which requires more than speculative but less than but-for causation." *Id.* (internal quotation marks omitted).

*Galaria*'s traceability analysis applies here. Had Judge Kuhn given Kitchen a much shorter sentence, Kitchen would have no injury under *Graham*. But had the hackers not compromised Nationwide's computers, the plaintiffs in *Galaria* would also have had no injury. In other words, Defendants in this case are akin to

18

Nationwide: if Nationwide had implemented better security measures, the *Galaria* plaintiffs would not have been injured, and if Defendants here stop enforcing the laws limiting the parole board's jurisdiction to the completion of Kitchen's minimum sentence, Kitchen would no longer be injured. Thus, the Court is not persuaded by Defendants' traceability argument.

Defendants also argue that Kitchen has not suffered an injury in fact. According to Defendants, the statutory provision that Kitchen has expressly challenged—§ 791.234(1)—"has not been applied to his sentence." (ECF No. 95, PageID.995.) In their view, "[b]efore § 791.234(1) can be applied to Kitchen's sentence and the Parole Board can assume jurisdiction," Kitchen must complete his minimum sentence. (*See id.*) Defendants say that Kitchen has "simply challenged the application of § 791.234(1) to his sentence too early." (ECF No. 95, PageID.996.)

Defendants' reading of § 791.234(1) is circular. They argue that the condition that § 791.234(1) itself creates—that a prisoner "is subject to the jurisdiction of the parole board when the prisoner has served . . . [his] minimum sentence" (less disciplinary credits)—is a condition for § 791.234(1)'s application. But § 791.234(1) does not create a precondition for its own application. Instead, § 791.234(1) applied the very second that Kitchen was sentenced: once Kitchen was given a minimum sentence, § 791.234(1) (and other Parole-Eligibility Laws) operated to restrict the parole board's jurisdiction until Kitchen completed that sentence.

Finally, Defendants argue that Kitchen's injury is not redressable. According to Defendants, for Kitchen's parole review to be moved up, "this Court would need to

either (A) shorten the length of Kitchen's minimum sentence or (B) restore disciplinary credits he forfeited through misconduct in prison." (ECF No. 95, PageID.999.)

The Court's ability to redress Kitchen's injury is not so limited. If this Court were to find that the Parole-Eligibility Laws cannot be lawfully applied to Kitchen, then there would be nothing prohibiting the board from exercising jurisdiction over Kitchen immediately. And that is exactly the relief Kitchen seeks in this case. (*See* ECF No. 78, PageID.697 (seeking a declaration that § 791.234(1) is unconstitutional and requesting an injunction "requiring the Michigan Parole Board to immediately take jurisdiction over Mr. Kitchen").)

In sum, the Court finds that Kitchen has Article III standing to pursue a claim under *Graham*.

## 2.

Apart from standing, Defendants say that this Court lacks subject-matter jurisdiction over Kitchen's claims for a second reason: the *Rooker-Feldman* doctrine. Defendants point out that the *Rooker-Feldman* doctrine deprives a federal district court of subject-matter jurisdiction when the source of the plaintiff's injury is a state court judgment. (*See* ECF No. 95, PageID.1002–1003.) And in Defendants' view, "[t]he source of Kitchen's injury is the sentence imposed by the state sentencing judge." (ECF No. 95, PageID.1004.) They argue that Kitchen's injury "has nothing to do with" the Parole-Eligibility Laws or their application of those laws. (*See id.*) Thus,

say Defendants, the Court cannot exercise jurisdiction over Kitchen's claims under the *Rooker-Feldman* doctrine.

Start with the law. The *Rooker-Feldman* doctrine "applies only to the 'narrow' set of 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 402 (6th Cir. 2020) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). "If the source of the plaintiff's injury is the state-court judgment itself, then *Rooker-Feldman* applies." *Larry E. Parrish. P.C. v. Bennett*, 989 F.3d 452, 456 (6th Cir. 2021). And to identify the source the plaintiff's injury, "a court must look to the requested relief." *Id.*

Applying this law, it is apparent that the *Rooker-Feldman* doctrine does not deprive this Court of subject-matter jurisdiction over Kitchen's claim under *Graham*. In pursuing a claim under *Graham*, Kitchen alleges that due to a shortened lifespan attributable to many years in prison, his 42-year sentence means that he will die in prison or, at least, a parole hearing will come so late in his life that it will not be a "meaningful opportunity to obtain release," 560 U.S. at 75. As relief, Kitchen asks this Court to declare the Parole-Eligibility Laws unconstitutional as applied to him, which would allow him to have an immediate parole hearing, i.e., a "meaningful opportunity to obtain release." Thus, nothing about the claim or the relief for prevailing on that claim "invit[es] district court review and rejection of" Judge Kuhn's judgment. *Exxon Mobil*, 544 U.S. at 284; *see also VanderKodde v. Mary Jane M.*

21

*Elliott, P.C.*, 951 F.3d 397, 409 (6th Cir. 2020) (Sutton, J., concurring) ("Absent a claim seeking review of a final state court judgment, a federal court tempted to dismiss a case under *Rooker-Feldman* should do one thing: Stop."). As such, *Rooker-Feldman* does not deprive this Court of jurisdiction over Kitchen's claim under *Graham*.

<h3 style="text-align:center">3.</h3>

With those jurisdictional issues resolved, the Court turns to the merits of Kitchen's claim under *Graham*.

A good place to start is with *Graham* itself. There, the Supreme Court placed an obligation on the States: "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State *must* do, however, is give defendants like Graham some *meaningful* opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 75 (2010) (emphases added). Thus, under *Graham*, Michigan "must" give Kitchen ("a juvenile offender convicted of a nonhomicide crime") "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *See Carter v. State*, 192 A.3d 695, 720 (Md. 2018) ("[A] 'meaningful opportunity to obtain release based on demonstrated maturity or rehabilitation'—by parole or otherwise—is not simply a 'matter of grace' for juveniles serving life sentences. It is required by the Eighth Amendment.").

But what does a "meaningful" opportunity for release entail? One interpretation is that as long as a juvenile, nonhomicide offender is evaluated for

release at any point prior to his or her death, that evaluation is a "meaningful." For instance, although relying on authority that would later be reversed, the Nebraska Supreme Court has opined, "we . . . 'do not believe *Graham* mandates that defendants have a meaningful life outside of prison in which to engage meaningfully in a career or raising a family.'" *State v. Smith*, 892 N.W.2d 52, 66 (Neb. 2017) (quoting *State v. Zuber*, 126 A.3d 335, 347 (N.J. App. Div. 2015), *rev'd and remanded*, 152 A.3d 197 (N.J. 2017)).

But the Supreme Court itself has hinted that parole review when a juvenile has mere months to live is not "meaningful." In particular, the Court has stated, "[juvenile offenders] like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for *some years of life outside prison walls* must be restored." *Montgomery v. Louisiana*, 577 U.S. 190, 213 (2016) (emphasis added); *see also Graham*, 560 U.S. at 82 (providing that if a state "imposes a sentence of life," it "must" provide the juvenile, nonhomicide offender "with some realistic opportunity to obtain release *before the end of that term*" (emphasis added)); *cf. Starks v. Easterling*, 659 F. App'x 277, 280 (6th Cir. 2016) (noting the Supreme Court's "growing unease with draconian sentences imposed upon juveniles, even for serious crimes").

Further, several state supreme courts have interpreted a "meaningful opportunity to obtain release" as a meaningful opportunity for a life outside of prison.

The Iowa Supreme Court stated, "The prospect of geriatric release . . . does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation'

required to obtain release and reenter society as required by *Graham*." *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013).

The Wyoming Supreme Court found the Iowa Supreme Court's reasoning "to be persuasive." *Bear Cloud v. State*, 334 P.3d 132, 142 (Wyo. 2014). The Court added, "As a practical matter, a juvenile offender sentenced to a lengthy term-of-years sentence will not have a 'meaningful opportunity for release.'" *Id.*

The Connecticut Supreme Court reasoned similarly: "A juvenile offender is typically put behind bars before he has had the chance to exercise the rights and responsibilities of adulthood, such as establishing a career, marrying, raising a family, or voting." *Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1046 (Conn. 2015). "Even assuming the juvenile offender does live to be released," the Court continued, "after a half century of incarceration, he will have irreparably lost the opportunity to engage meaningfully in many of these activities and will be left with seriously diminished prospects for his quality of life for the few years he has left." *Id.* "The United States Supreme Court viewed the concept of 'life' in *Miller* and *Graham* more broadly than biological survival; it implicitly endorsed the notion that an individual is effectively incarcerated for 'life' if he will have no opportunity to truly reenter society or have any meaningful life outside of prison." *Id.*

The Washington Supreme Court also interpreted *Graham* this way. "As our sister states have persuasively reasoned, '[t]he United States Supreme Court . . . implicitly endorsed the notion that an individual is effectively incarcerated for 'life' if he will have no opportunity to truly reenter society or have any meaningful life

outside of prison.'" *State v. Haag*, 495 P.3d 241, 251 (Wash. 2021) (quoting *Casiano*, 115 A.3d at 1046). The Court explained, "Haag, having committed a terrible crime at the age of 17, deserved and received punishment—but given the shortened life expectancy and compromised health associated with life in prison, releasing Haag from confinement at the age of 63 deprives him of a meaningful opportunity to return to society, depriving him of a meaningful life." *Id.*

The Supreme Court of California has interpreted *Graham* similarly. "Although the [California] Attorney General says a penalty is not invalid under *Graham* unless it 'is tantamount to [a] sentence of death,' he does not seriously contend that a term-of-years sentence with parole eligibility at any point before the end of life expectancy—whether it is one year, one month, or one day—would satisfy the Eighth Amendment." *People v. Contreras*, 411 P.3d 445, 453–54 (Cal. 2018). The Court further explained, "the language of *Graham* suggests that the high court envisioned more than the mere act of release or a *de minimis* quantum of time outside of prison. *Graham* spoke of the chance to rejoin society in qualitative terms." *Id.*

Absent binding authority from the Sixth Circuit, this Court finds the views of the Iowa, Wyoming, Connecticut, Washington, and California supreme courts to be persuasive. Accordingly, in this Court's opinion, *Graham*'s "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" means that parole review must come at a point in the juvenile, nonhomicide offender's lifetime when he or she can "truly reenter society" and "have [a] meaningful life outside of prison." *Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1046 (Conn. 2015); *see also*

25

Sarah French Russell, *Review for Release: Juvenile Offenders, State Parole Practices, and the Eighth Amendment*, 89 Ind. L.J. 373, 408 (2014) ("[T]he better view is that a 'meaningful opportunity' for release means that review should come at a point in time that provides the prisoner with the chance to live a meaningful life outside of prison."); Parag Dharmavarapu, Comment, *Categorically Redeeming Graham v Florida and Miller v Alabama*, 86 U. Chi. L. Rev. 1439, 1464–65 (2019) (agreeing with Russell, surveying parole practices across the country, and concluding that the "maximum" number of years before parole eligibility should be 26 years).

Having articulated its interpretation of *Graham*, the Court turns to this case. In doing so, the Court stresses that the dispute is significantly cabined.

First, the parties' arguments have narrowed the dispute. True, Defendants make the broad, legal argument that *Graham* only applies to a life-without-parole sentence—a sentence that Kitchen did not receive. But, in the alternative, Defendants make a fact-based argument: that Kitchen will be reviewed for parole when he still has a "decade" to live. (ECF No. 98, PageID.1093–1096.) And in making this alternative argument, Defendants do not argue that a comparison of Kitchen's life expectancy against his parole-eligibility date is not the proper method of deciding whether he will have a meaningful opportunity for release under *Graham*. In fact, Defendants employ this very methodology: they rely on the life expectancy provided by Kitchen's expert to argue that Kitchen's parole-eligibility date gives him the opportunity for a "decade outside of prison." (ECF No. 98, PageID.1093–1096; ECF No. 95, PageID.1007.)

Second, the factual record has narrowed the dispute. Kitchen has provided the Court with Dr. Christopher Wildeman's opinion on his life expectancy. (ECF No. 94-6, PageID.873.) In response, Defendants have not argued that Wildeman's opinion does not satisfy the requirements of Federal Rule of Evidence 702, and the deadline to do so has passed. (*See* ECF No. 92, PageID.801.) Nor have Defendants offered a rebuttal expert. In fact, "Defendants' counsel made the strategic choice to not retain a rebuttal expert due to the fact that Dr. Wildeman's testimony so clearly benefits Defendants." (ECF No. 98, PageID.1095.) Accordingly, for purposes of deciding the parties' cross motions, the Court considers Wildeman's estimates of Kitchen's life expectancy to be unrebutted.

Third, the nature of Kitchen's claim has narrowed the dispute. Kitchen does not seek a declaration that the Parole-Eligibility Laws are generally unconstitutional. He instead seeks a declaration that Defendants' application of those laws to him violates his constitutional rights. (ECF No. 78, PageID.697.) To that end, Kitchen merely argues that—given *his* particular life expectancy and *his* particular sentence—the Parole-Eligibility Laws cannot be constitutionally applied to *him*. (ECF No. 94, PageID.824–825.) Thus, Kitchen's *Graham* claim does not require the Court to make any general findings about the constitutionality of lengthy term-of-year sentences for juvenile, nonhomicide offenders.

Taking these points together, the question before the Court is narrow: do the Parole-Eligibility Laws deprive Michael Kitchen, with his life expectancy and his sentence, a "meaningful" opportunity to obtain release as mandated by *Graham*?

27

The Court's answer is "yes." The explanation consists of three parts.

First consider Kitchen's age at his parole-eligibility date. According to Defendants, Kitchen's parole-eligibility date is September 9, 2027. (ECF No. 95-3, PageID.1033.) Kitchen was born on October 30, 1969 (ECF No. 94-3, PageID.849), meaning that he will be nearly 58 years old when he is first eligible for parole board review. (Notably, if Kitchen loses disciplinary credit, he will be even older when he is first reviewed for parole.)

Next consider Dr. Wildeman's unrebutted opinion about Kitchen's life expectancy. When Wildeman authored his expert report, Kitchen was 51 years old. Wildeman opined that "[l]ife expectancy at age 50 for an African American male is currently just under 25 additional years of life" (ECF No. 94-6, PageID.872), i.e., just under 75 years old. But Wildeman further opined, "I would anticipate that an individual who has been exposed to extensive solitary confinement and has a poorly controlled medical condition while imprisoned like Mr. Kitchen could reasonably be expected to have life expectancy at age 50 that is 5–20 years less than that of a similar individual in the general population." (ECF No. 94-6, PageID.872.) In other words, a reasonable range for Kitchen's life expectancy is 55 years to 70 years. Wildeman, however, then narrowed the reasonable range. In particular, he opined that a "10–15 year lower life expectancy" was "especially plausible" and that a 10–15 year decrease in life expectancy was his "most confident estimate." (ECF No. 94-6, PageID.872.) Thus, based on Wildeman's expert opinion, the best estimate of Kitchen's life expectancy is 60 years to 65 years. Or, in Wildeman's words, "Kitchen's risk of death

by his early 60s would be quite high." (ECF No. 94-6, PageID.873; *see also* ECF No. 94-8, PageID.969 ("the highest probability strikes me as early 60's").) And, as noted, that opinion has not been challenged as unreliable and there is no contrary opinion of record.

Now combine the prior two parts with the interpretation of *Graham* provided by the Connecticut Supreme Court, Supreme Court of California, and other state supreme courts. When Kitchen is first eligible for parole, he will be almost 58 years old. And according to the unrebutted opinion evidence, Kitchen will most likely live only to his "early 60s," say 62 or 63. Thus, if Defendants continue to enforce the Parole-Eligibility Laws against Kitchen, he would only have an opportunity for a few years outside of prison. In this Court's opinion, that is simply not enough time for Kitchen—who has known only prison for every day of his adult life based on a criminal sexual conduct conviction as a juvenile—to "truly reenter society" and "have [a] meaningful life outside of prison." *Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1046 (Conn. 2015); *People v. Contreras*, 411 P.3d 445, 454 (Cal. 2018) ("For any individual released after decades of incarceration, adjusting to ordinary civic life is undoubtedly a complex and gradual process."). Accordingly, because Michigan's Parole-Eligibility Laws delay Kitchen's parole review to the point when his opportunity for release is no longer "meaningful" under *Graham*, they are unconstitutional as applied to Kitchen.

Defendants make several arguments to resist this conclusion, but none are persuasive.

As noted, Defendants' lead argument is that *Graham* simply does not apply to Kitchen's sentence "because [Kitchen] was not sentenced to life in prison." (ECF No. 98, PageID.1091–1092; *see also* ECF No. 95, PageID.1013 ("There is no *Graham* violation here because Kitchen was not sentenced to life in prison.").)

To the extent that Defendants maintain that *Graham* can only ever apply to life-without-parole sentences, their argument elevates form over substance. To be sure, *Graham* only expressly prohibited sentencing juvenile, nonhomicide offenders to "life in prison without parole." 560 U.S. at 52–53. But in the context of *Graham* (and *Miller*), courts talk about the "functional equivalent" of a life sentence. Indeed, few would debate that sentencing a juvenile, nonhomicide offender to "100 years in prison without parole" as opposed to "life in prison without parole" is wordplay—both sentences ensure that the juvenile will die in prison. *See McKinley v. Butler*, 809 F.3d 908, 911 (7th Cir. 2016) (finding that a 100-year sentence for a juvenile offender is a de facto life sentence); *State v. Shanahan*, 445 P.3d 152, 159 (Idaho 2019) ("[I]t could not reasonably be argued that a 100-year fixed sentence would provide a meaningful opportunity for release."); *Atkins v. Crowell*, 945 F.3d 476, 481 (6th Cir. 2019) (Cole, J., concurring) (noting the "absurd result" of allowing "sentencing courts to circumvent *Miller* by sentencing juveniles to a term of years that exceeds the juvenile's projected lifespan"). Thus, logically, *Graham* at least extends to de facto life-without-parole sentences.

30

But, Defendants insist, "[t]he Sixth Circuit has interpreted *Graham* as not extending to non-life sentences." (ECF No. 98, PageID.1093.) Defendants refer to *Bunch v. Smith*, 685 F.3d 546, 549 (6th Cir. 2012).

Defendants read *Bunch* too broadly. *Bunch* was a habeas decision under 28 U.S.C. § 2254(d). *See* 685 F.3d at 549. In other words, the Sixth Circuit was only tasked with deciding whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* Indeed, all the Sixth Circuit held is that *Graham* "did not *clearly establish* that consecutive, fixed-term sentences for juveniles who commit multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole." *Id.* at 550 (emphasis added). Even if *Graham* did not "clearly establish" that juvenile, nonhomicide offenders cannot be sentenced to lengthy term-of-years sentences, that does not preclude a finding that *Graham* applies to lengthy term-of-years sentences— again consider the 100-years-without-parole sentence. Indeed, in addressing a *Graham* claim under § 2554(d), the Supreme Court stated: "Because this case arises only in [the] narrow context [of federal habeas review] the Court expresses no view on the merits of the underlying Eighth Amendment claim." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728–29 (2017) (original alterations and internal quotation marks omitted). Moreover, Bunch received a series of 10-year sentences for many crimes, while Kitchen received 40 (to 60) years for single crime. *See In re Pinchon*, No. 17-5104, 2017 WL 11037420, at *2 (6th Cir. Aug. 18, 2017) (distinguishing *Bunch* where juvenile offender's single sentence amounted to 51 years without parole). Given

§ 2254(d) and the serial sentences at issue, *Bunch* does not foreclose this Court's finding that *Graham* applies to Kitchen's sentence.

Undeterred, Defendants say that even if *Graham* extends to de facto life sentences, "Kitchen is not . . . serving a de facto life sentence." (*See* ECF No. 95, PageID.1007.) In support of this argument, Defendants point out that Kitchen's parole-eligibility date is before he turns 58 and that, according to Wildeman, "[t]here's a reasonable chance that Mr. Kitchen will still be alive at 57 to 58." (ECF No. 95, PageID.1007 (citing ECF No. 94-8, PageID.953); *see also* ECF No. 98, PageID.1095.)

Although the evidence does indicate that Kitchen's first parole review will most likely come before he dies, *Graham* expressly stated that States "*must*" give juvenile, nonhomicide offenders "some *meaningful* opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 75 (emphasis added). And as explained at length above, several state supreme courts have interpreted this mandate as requiring parole review when the juvenile offender can still "truly reenter society" and still "have [a] meaningful life outside of prison." And as stated, this Court finds those state supreme court decisions persuasive. As such, even if (as Defendants claim) Kitchen is not serving a de facto life-without-parole sentence, that fact is not dispositive of his claim under *Graham*.

In a similar vein, Defendants argue that several federal appellate courts have found that "juvenile sentences longer than 42 years present no Eighth Amendment problem." (ECF No. 98, PageID.1101; *accord* ECF No. 95, PageID.1014.) The Court has reviewed the cases Defendants cite, and all involved a claim under *Miller*.

(Moreover, in each case, the sentencing judge actually considered the mitigating factors of youth.) *See United States v. Briones*, 18 F.4th 1170, 1175–76 (9th Cir. 2021); *United States v. Grant*, 9 F.4th 186, 197–98 (3d Cir. 2021); *United States v. Friend*, 2 F.4th 369, 378 (4th Cir. 2021); *United States v. Barraza*, 982 F.3d 1106, 1116 (8th Cir. 2020); *United States v. Portillo*, 981 F.3d 181, 184 (2d Cir. 2020).

True, in *Friend*, the Fourth Circuit took the further step of finding that a 52-year sentence is not a de facto life sentence. *United States v. Friend*, 2 F.4th 369, 378 (4th Cir. 2021). But this Court has not determined that Kitchen's 42-year sentence is a de facto life sentence; instead, this Court has determined that given Wildeman's unchallenged opinion that Kitchen is most likely to live only to his early 60s, Kitchen's 42-years-without-parole sentence deprives him of a "meaningful opportunity to obtain release."

Apart from the difference in holdings, though, the Fourth Circuit's determination that a 52-year sentence was not a de facto life sentence raises an issue that deserves comment. This Court has reviewed many opinions addressing lengthy term-of-years sentences imposed on juvenile offenders. And like the Fourth Circuit in *Friend*, other courts have found that sentences longer than Kitchen's do not implicate *Miller* or *Graham*. *See e.g., Grace v. State*, 324 So. 3d 552 (Fla. Dist. Ct. App. 2021) (finding 50 years without parole to comport with *Graham*); *Ira v. Janecka*, 419 P.3d 161 (N.M. 2018) (finding that although 45.5 years without parole was at the "outer limit" of what was constitutionally acceptable, the sentence comported with *Graham*). If Kitchen's life expectancy was the same as the life expectancy of a similarly situated

person in the general population, e.g., 75 years, this Court, like others, would find that 42 years in prison without parole is not long enough to implicate *Graham*. But what makes this case different is that there is unchallenged evidence that Kitchen is likely to die in his early 60s. Thus, relatively speaking, Kitchen's 42-year sentence is longer than a 50-year sentence imposed on a juvenile offender who is expected to live until age 75 or beyond. *Cf. State v. Smith*, 892 N.W.2d 52, 64 (Neb. 2017) ("[T]he presentence report supports that the average life expectancy for someone Smith's age is 78.8 years, and as discussed above, Smith is eligible for release at 62 years of age.").

Apart from arguing that *Graham* only applies to life-without-parole sentences, Defendants alternatively argue that even if Graham extends to term-of-years sentences, Kitchen's September 2027 parole-eligibility date offers him a "meaningful opportunity to obtain release." (*See* ECF No. 98, PageID.1093.) According to Defendants, "Wildeman's analysis gives Kitchen a 20% chance of living 5–10 more years, a 60% chance of living 10–15 more years, and a 20% chance of living 15–20 more years." (ECF No. 98, PageID.1096 (citing ECF No. 94-8, PageID.968–969).) Because Wildeman offered his opinion when Kitchen was almost 52 years old, and because Kitchen's parole-eligibility date is just before he turns 58, Defendants subtract six years from each of these ranges to reason that at the time of Kitchen's first parole review, he will have a "60% chance of living at least 4 to 9 more years, and a 20% chance of living longer than that." (ECF No. 98, PageID.1096.) "Thus," say Defendants, "if Kitchen is granted parole in September 2027, there is a reasonable chance he will live for another decade outside of prison." (ECF No. 98, PageID.1096.)

And, in Defendants' view, *Graham* cannot possibly stand for the proposition that juvenile offenders must have the opportunity for a "decade or more outside of prison." (*See* ECF No. 98, PageID.1096.)

A careful review of Wildeman's report and deposition testimony reveals that this argument lacks merit.

Start with Wildeman's report. The report is unequivocal that an African-American male who has lived to age 50 has a life expectancy of just under 75 years. (ECF No. 94-6, PageID.862, 872.) And the report is unequivocal that due to the ill effects of prison, it is reasonable to conclude that Kitchen's life expectancy is five to 20 years shorter (ECF No. 94-6, PageID.864, 872), i.e., a reasonable range for Kitchen's life expectancy is 55 years old (20-year decrease) to 70 years old (five-year decrease). Wildeman was also clear that 10 to 15 years of decreased life expectancy was "especially plausible" and his "most confident estimate." (ECF No. 94-6, PageID.872.) In other words, although 55 to 70 is a reasonable range, Kitchen is most likely to live to an age between 60 (15-year decrease) and 65 (10-year decrease). (*See* ECF No. 94-6, PageID.862; ECF No. 94-8, PageID.969.)

During his deposition, Wildeman was asked about the broader five to 20-year decrease in life expectancy, and, consistent with his report, testified that between 55 and 70 years old was the "reasonable range." (ECF No. 94-8, PageID.966.) Ultimately, Wildeman was asked if his estimate of 10 to 15 years had a 51 percent chance of being correct whereas his estimate of five to 20 years had only a 49 percent chance of being correct. (*See* ECF No. 94-8, PageID.969.) Wildeman responded, "20 percent chance

shorter range, 60 percent chance most confident range, and 20 percent chance longer range." (*Id.*) In light of his report, and the prior questioning about the five to 20 years of decreased life expectancy, it is apparent that Wildeman's "shorter range" was the 15-to-20-year decrease in life expectancy, the "most confident range" was the 10-to-15-year decrease, and the "longer range" was a five-to-10-year decrease. Thus, Wildeman's testimony can be summarized in the following chart:



(*See also* ECF No. 94-8, PageID.969 (opining that "the highest probability strikes me as early 60's"); ECF No. 94-6, PageID.872 (opining that Kitchen's "risk of death by his early 60s would be quite high").)

In short, the correct interpretation of Wildeman's report and testimony shows that Defendants incorrectly claim that "there is a reasonable chance [Kitchen] will live for another decade outside of prison." To the contrary: Wildeman opined that when Kitchen is reviewed for parole just prior to turning 58, Kitchen has only a 20% chance of living beyond age 65, i.e., only a 20% chance of living more than seven years past his parole-eligibility date.

\* \* \*

In sum, because the undisputed record shows that Kitchen will become eligible for parole when he most likely has only four or five years left to live, the Court finds that Michigan's Parole-Eligibility Laws deprive Kitchen of a "meaningful" opportunity for release under *Graham*. Michigan's Parole-Eligibility Laws are thus unconstitutional as applied to Kitchen.

## C.

That leaves Kitchen's claim that Defendants' conduct subjects him to "cruel or unusual punishment" as prohibited by the Michigan Constitution.

Assuming that this Court has subject-matter jurisdiction over this claim, that jurisdiction would be supplemental to the federal claims. And, when there are good reasons, a federal district court can decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c).

Here, there are good reasons. To start, the parties have not argued Kitchen's state-law claim in depth. Instead, the parties have focused on Kitchen's claims under the Federal Constitution. Indeed, Kitchen's motion for summary judgment devotes about a page-and-half to his state-law claim. (ECF No. 94, PageID.832–33.) Second, Kitchen asks this federal court to decide a claim that is state law in the purest sense: Kitchen claims that a sentence imposed by a state judge for a state crime violates the state constitution. Third, given that this Court has ruled in Kitchen's favor under *Graham*, there is no need to opine on the merits of his state-law claim: a remedy for the *Graham* violation can provide Kitchen with the relief he seeks. Fourth, all of the discovery done in this case, including Wildeman's report and deposition, can be used

in state court if Kitchen pursues his state-law claim there. And, finally, dismissal now would not create any statute-of-limitations bar that did not already exist. *See Artis v. D.C.*, 138 S. Ct. 594, 603 (2018). For all these reasons, even if the Court had subject-matter jurisdiction over Kitchen's claim under the Michigan constitution, it would decline to exercise that jurisdiction.

## IV.

For the reasons provided, Kitchen's motion for summary judgment is granted in part and denied in part and Defendants' motion for summary judgment is granted in part and denied in part.

Regarding Kitchen's claim under *Miller v. Alabama*, 567 U.S. 460 (2012), he lacks Article III standing to pursue that claim against the named defendants, and, in the alternative, the claim fails on the merits in light of *Jones v. Mississippi*, 141 S. Ct. 1307 (2021). Accordingly, Kitchen's claim based on Miller is DISMISSED.

Regarding Kitchen's claim under the Michigan Constitution, this Court declines to exercise supplemental jurisdiction over that claim. Accordingly, Kitchen's claim based on the Michigan Constitution is DISMISSED WITHOUT PREJUDICE.

Finally, regarding Kitchen's claim under *Graham v. Florida*, 560 U.S. 48 (2010), the Court finds that Michigan's laws and regulations that limit the parole board's jurisdiction until Kitchen completes his 42-year minimum sentence (less disciplinary credits) are unconstitutional as applied to Kitchen. In *Graham*, the Supreme Court stated, "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however,

38

is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. *It is for the State, in the first instance, to explore the means and mechanisms for compliance*." 560 U.S. at 75 (emphasis added). Accordingly, Defendants have until September 9, 2022 to submit a plan for the Court's approval as to how it will provide Kitchen with a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," which as this opinion has made clear, includes an opportunity for release at a time when Kitchen can "truly reenter society" and "have [a] meaningful life outside of prison." *Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1046 (Conn. 2015). Absent truly extraordinary circumstances, this time for submitting a plan will not be extended.

SO ORDERED.

Dated: July 21, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE